DA 09-0626

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2010 MT 125

JOHN R. STEAB,

Petitioner and Appellee,

v.

LAUNA J. LUNA,

Respondent and Appellant.

APPEAL FROM: District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. ADR 02-82
Honorable Dorothy McCarter, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Benjamin C. Tiller; The Law Offices of Benjamin C. Tiller;
Helena, Montana

For Appellee:

Julie A. Johnson; Gough, Shanahan, Johnson & Waterman, PLLP;
Helena, Montana

Submitted on Briefs: April 21, 2010

Decided: June 3, 2010

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1    Launa Luna appeals the judgment of the District Court for the First Judicial District, Lewis and Clark County, which modified the parties' parenting plan by granting, *inter alia*, primary residential custody of K.S. to Appellee John Steab.  Launa challenges the modification on numerous grounds, including that the court violated her due process rights, entered clearly erroneous factual findings and abused its discretion.  Because we conclude Launa's due process argument is dispositive, we do not reach her other arguments.

¶2    The issue on appeal is whether the District Court violated Launa's due process rights by modifying the parenting plan without proper notice to Launa that John sought primary residential custody of their daughter, K.S.?

## FACTUAL AND PROCEDURAL BACKGROUND

¶3    Launa and John are the biological parents of three children:  their son, T.J., who is 22, and their daughters J.S., age 19, and K.S., age 9.  This appeal concerns a change to the parenting plan for 9-year-old K.S., modifying the primary residential parent from Launa, who resides in Utah, to John, who resides in Montana.  The District Court modified the parenting plan after receiving testimony that the family's son T.J. had subjected J.S. to repeated sexual abuse, and that K.S. was in danger of the same abuse.  Some background regarding these unfortunate circumstances is pertinent to the appeal.

¶4    In 1999, while Launa and John were married, the family learned that J.S. had been sexually abused by the children's uncle, Chase, on numerous occasions when she was five or six years of age.  Launa and John sought counseling for J.S., and separated the

2

family from Chase. Launa and John subsequently divorced in 2002 and, pursuant thereto, a parenting plan designating Launa as the primary residential parent of K.S was adopted by the court. In 2007, with the court's approval, Launa moved to Utah with K.S. and T.J. and, pursuant to the parenting plan, John maintained continuous contact with the children after Launa's move.

¶5 In the early fall of 2008, the family learned that T.J. had also been sexually abused by Chase in 1999, and that, in turn, T.J. had also sexually abused J.S. when she was 9 years old and T.J. was 12 years old. These events had occurred while Launa and John were still married and living together, before K.S. was born. No evidence that K.S. has been sexually abused has been offered.

¶6 After learning of the abuse between T.J. and J.S., John contacted the Davis County Sheriff's Office in Utah. Detective West of that office conducted a forensic interview of K.S. to determine if she had been harmed by T.J. Detective West noted that K.S. exhibited a consistent reaction while discussing each member of her family, although she indicated that T.J. asked her to hug him about ten times a day and that he did not hug her back. Detective West noted in his report that this behavior "could be the beginning of the grooming process," but that he could not presently make that determination. Given K.S.'s reactions and the lack of an indication of abuse, Detective West concluded that T.J. had not abused K.S. and ended his investigation.

¶7 On September 24, 2008, John filed an emergency ex parte motion requesting the District Court temporarily place K.S. in his care pending a hearing on the matter, given T.J.'s history of sexual abuse. John's motion did not include Detective West's report, but

provided his affidavit which stated that K.S. told him that T.J. would be babysitting her, and that she had recently been left alone to watch television with T.J. at Launa's home in Utah.

¶8 The District Court granted John's ex parte motion the day it was filed, ordering K.S. placed in John's custody pending a hearing. Pursuant thereto, John took K.S. from her school in Utah the following day and returned with her to Montana. The next day, September 26, 2008, Launa filed a motion for immediate rescission of the ex parte order, and return of K.S. to her. On October 1, 2008, after reviewing Detective West's incident report attached to Launa's motion, the District Court vacated the ex parte order. The court found insufficient evidence to amend the parenting plan on an emergency, ex parte basis, and indicated it would hold a hearing upon receipt of a joint parental custody evaluation. K.S. returned to Utah, where she continued to maintain her primary residence with Launa and her step-father.

¶9 On December 4, 2008, Launa and John stipulated to Dr. Heather Walker conducting the parenting evaluation. The District Court accepted the parties' stipulation and ordered Dr. Walker to perform the evaluation. After traveling to both parties' homes in Utah and Montana and interviewing individuals who had meaningful contact with K.S., Dr. Walker met with both John and Launa, and discussed her recommendations. Dr. Walker's parenting evaluation affirmed Launa as the primary residential parent of K.S., but recommended that John be granted more parenting time in the summer with K.S.

4

¶10    Following Dr. Walker's evaluation, John's attorney drafted a revised parenting plan which he provided to Launa and her lawyer on August 26, 2009. John's proposed parenting plan stated that it was "in accordance with the evaluators [sic] August 2009 recommendations," and provided that Launa would have "primary physical custody" and that K.S. "shall reside primarily at her mother's residence." On September 17, 2009, John requested a hearing regarding modification of the parenting plan. In his motion, John stated that he had "sent his proposed modifications to the parenting plan *incorporating Dr. Walker's recommendations*" to Launa. (Emphasis added.) A hearing was set for October 30, 2008.

¶11    At the hearing, Launa's counsel raised an initial objection about the pleadings, noting that no motion to amend the parenting plan had actually been filed and that the order vacating the ex parte order was the only suggestion of a modification to the parenting plan in the record. The court responded that the order had put the parties on notice and that, given time restraints, the court did not want to address procedural aspects of the case.

¶12    John's counsel began by submitting his proposed findings of fact, conclusions of law and parenting plan, and stating that John was requesting a "switch in primary custodial parents from mother to father and to protect [K.S.] from the potential of more sexual abuse[,] based on the recommendations of Donna Hale." Following counsel's comment regarding Donna Hale, the District Court disclosed that it had received a letter from Ms. Hale on October 26, 2009, which it provided to the parties. Hale's letter to the court stated that Hale wanted to "refresh some of [their] conversations and add additional

5

information regarding the Steab case," and asked the court to "keep this case and allow [the] hearing to occur."

¶13 John called Ms. Hale, a licensed clinical social worker who had treated various members of the family. Ms. Hale admitted that she was not an expert on sex offenders "by choice," but the night before the hearing she had read "about four hours of literature research" on the internet about sex offenders in preparation for her testimony about T.J.'s potential dangerousness to K.S. Ms. Hale provided numerous recommendations regarding the best interests of K.S. and testified in support of John's request to change the primary residential parent. Ms. Hale based her opinion on the likelihood of T.J. reoffending and sexually assaulting K.S., particularly given that K.S. was the same age as J.S. when T.J. began sexually abusing J.S, and opined that Launa was seemingly indifferent to the situation.

¶14 Launa's counsel objected during Hale's testimony that there had "not been a request that the Court provide a parenting plan that gives primary custody to John. Only parenting plan that was presented along with the motion [did] not suggest a change of custody." John's counsel admitted that the first time a change of custody had been suggested was within the findings of fact submitted that day. The court stated, "Well now we know."

¶15 Cross-examining Hale, Launa's counsel addressed the letter Hale had sent to the court and asked, "Have you had out of court conversations regarding this case with Judge McCarter?" The District Court responded that "I think [Ms. Hale] may have had some with me but nothing of substance because we are friends and we go to lunch occasionally

6

and she talks about things, so the answer for her, she may have mentioned something about the case . . . ." After some additional dialogue, the court responded that Ms. Hale "doesn't talk a lot about substance of these cases," and that they try to talk about other things.

¶16 In Launa's case-in-chief, she called Dr. Walker, who had performed the court-ordered custody evaluation, and Rick Bashaw, T.J.'s current treating therapist. Based on her investigation, Dr. Walker believed it would be in K.S.'s best interest to remain primarily with Launa, but spend additional parenting time with John during the summer. Bashaw testified that T.J. was progressing well through his treatment program, and posed no threat to K.S. as long as their contact was supervised.

¶17 The District Court adopted Hale's recommendations and ordered that John would be the primary residential parent. Launa filed a motion to dismiss the proceedings with prejudice, arguing a lack of notice of the request to change the primary custodial parent and other due process violations. The District Court denied Launa's motion. Launa appeals.

**STANDARDS OF REVIEW**

¶18 We will reverse a district court's decision to modify custody or visitation only where an abuse of discretion is clearly demonstrated. *Arneson-Nelson v. Nelson (In re Arneson-Nelson)*, 2001 MT 242, ¶ 15, 307 Mont. 60, 36 P.3d 874 (citations omitted). Our review of conclusions of law is plenary. *Guffin v. Plaisted-Harmon*, 2009 MT 169, ¶ 6, 350 Mont. 489, 209 P.3d 225 (citation omitted).

7

**DISCUSSION**

¶19 ***Did the District Court violate Launa's due process rights by modifying the parenting plan without proper notice to Launa that John sought primary residential custody of their daughter, K.S.?***

¶20 Launa contends that the District Court violated her constitutional due process rights by proceeding on John's request to change the primary residential custodian without proper notice to her. Launa argues that she was disadvantaged and denied an opportunity to meaningfully prepare for the hearing and defend against the request.

¶21 John responds that Launa had notice that he was seeking a modification to the parenting plan which would grant him primary residential custody of K.S. He explains that, a week after filing his ex parte motion, the court held a conference with the parties regarding the ex parte order it had issued and thus, Launa was aware of his desire to obtain a permanent change in the primary residential custodian.

¶22 The United States and Montana Constitutions ensure that "[n]o person shall be deprived of life, liberty, or property without due process of law." Mont. Const. art. II, § 17; U.S. Const. amend. V. A natural parent's right to the care and custody of his or her child is a "fundamental liberty interest" that must be protected by "fundamentally fair procedures." *In re A.S.A.*, 258 Mont. 194, 197, 852 P.2d 127, 129 (1993) (citing *Santosky v. Kramer*, 455 U.S. 745, 753-54, 102 S. Ct. 1388, 1394-95 (1982)); *In re J.N.*, 1999 MT 64, ¶ 12, 293 Mont. 524, 977 P.2d 317 (citations omitted). Due process requires notice and the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mont. Power Co. v. Public Serv. Commn.*, 206 Mont. 359, 368, 671 P.2d 604, 609 (1983) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 902 (1976)

8

and *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S. Ct. 1187, 1190 (1965)); *In re Marriage of Fishbaugh*, 2002 MT 175, ¶ 15, 310 Mont. 519, 52 P.3d 395 (citation omitted). Notice must be "reasonably calculated to inform parties of proceedings which may directly and adversely affect their legally protected interests." *Mont. Power Co.*, 206 Mont. at 368, 671 P.2d at 609 (citation omitted).

¶23 We have previously considered due process challenges in cases involving modifications to parenting plans. In *In re Marriage of Huotari*, we held the father of a minor child was denied procedural due process by the district court's modification of the parenting plan when he was not provided notice or the opportunity to address the modification. 284 Mont. 285, 291, 943 P.2d 1295, 1299 (1997). In *State ex rel. Shelhamer v. Dist. Ct.*, we held the district court erred by modifying the custody provisions of the parenting plan when the proceeding before the court was noticed for nonsupport and contempt issues. 159 Mont. 11, 12-15, 494 P.2d 928, 929-30 (1972). We explained that "if a permanent change in custody appears to the court to be necessary then due process requires that an application be made for that purpose and proper notice of such application be given." *Shelhamer*, 159 Mont. at 15, 494 P.2d at 930.

¶24 We pause to note that a number of our cases have, unfortunately, also identified this problem as one of "issue jurisdiction," and we have held, in circumstances similar to those of *Shelhamer* and *Huotari*, that the district court lacked "issue jurisdiction" to modify the parenting plan where the issue of a modification to the final parenting plan was not pleaded or noticed before the hearing. *See In re Marriage of Pasquale*, 220 Mont. 497, 499, 716 P.2d 223, 224-25 (1986); *In re Custody of C.S.F.*, 232 Mont. 204,

209, 755 P.2d 578, 581-82 (1988); *In re Custody of C.J.K.*, 258 Mont. 525, 527-28, 855 P.2d 90, 91 (1993); *In re Marriage of Boyer*, 274 Mont. 282, 286-87, 908 P.2d 665, 667-68 (1995); *In re Marriage of Bradshaw*, 270 Mont. 222, 231-32, 891 P.2d 506, 512 (1995). In recent years we have sought to correct the misuse of the term "jurisdiction," *see Lorang v. Fortis Ins. Co.*, 2008 MT 252, ¶¶ 59-60, 345 Mont. 12, 192 P.3d 186, and we take this opportunity to clarify that the reversible error in cases such as *Pasquale*, *C.S.F.*, *C.J.K.*, *Boyer*, and *Bradshaw* concerning the lack of notice and opportunity for a meaningful hearing was one of constitutional due process of law.

¶25 As in the above cases, we likewise conclude here that Launa was not provided adequate notice and opportunity to be heard regarding the request to remove her as primary residential parent for K.S. After the District Court rescinded its ex parte order, the parties stipulated to a joint parenting evaluation by Dr. Walker, which was ordered by the court. Dr. Walker recommended that Launa continue as primary residential parent, and John's pre-hearing pleadings—his proposed revised parenting plan and request for hearing—endorsed that recommendation. John's proposed parenting plan was "issued in accordance with the evaluators [sic] August 2009 recommendations," stating that Launa would have "primary physical custody" and that K.S. "shall reside primarily at her mother's residence." John's request for hearing indicated that he had "sent his proposed modifications to the parenting plan *incorporating Dr. Walker's recommendations*" to Launa and asked that this parenting plan be approved. (Emphasis added.) John acknowledged during the hearing that he first sought the primary residential custody change by his proposed findings of fact and conclusions of law, which were submitted to

10

the court and Launa at the hearing. To Launa's objection, the court responded by stating "Well now we know." This was unfortunately true, but Launa should have been given notice prior to the hearing that her status as primary residential parent was going to be challenged.

¶26 Further, we are troubled by the possible implications to Launa's due process rights of Ms. Hale's ex parte communications with the District Court. We have previously expressed concern regarding ex parte communications "designed to influence judicial action" as a potential violation of a litigant's constitutional due process rights. *State v. Champagne*, 245 Mont. 147, 150-52, 800 P.2d 154, 156-57 (1990). Ms. Hale's letter was written to the court "to refresh some of [their] conversations and add additional information regarding the Steab case (ADR-2002-082)." The letter expressed "grave concerns" about T.J. potentially abusing K.S, stated that K.S. expressed a "strong desire to spend more time with her father," and that "it is imperative that this case remain in Montana, in [the] court." Ms. Hale's letter concluded by asking the District Court to "keep this case and allow Friday's hearing to occur." The letter and its reference to previous communications raise the potential of an appearance of impropriety.

¶27 Given the procedural history of this case, we do not believe Launa was adequately notified of John's request for a change of the residential custodian prior to the hearing. Thus, Launa was denied due process of law. We reverse the judgment and remand for a new hearing and further proceedings consistent with this opinion.

11

¶28     Reversed and remanded.


                                        /S/ JIM RICE


We concur:


/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS