FILED

03/23/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0333

DA 20-0333

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 73N

IN RE THE MARRIAGE OF:

JEFFERY PATRICK HEENAN,

       Petitioner and Appellant,

  and

SARAH KATE WALLACE,

       Respondent and Appellee.

APPEAL FROM:    District Court of the Fourth Judicial District,
                   In and For the County of Missoula, Cause No. DDR-17-0194
                   Honorable John W. Parker, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              André Gurr, Melissa Stones-Smith, Garden City Law, PLLC, Kalispell,
              Montana

       For Appellee:

              Klaus D. Sitte, ASUM Legal Services, Missoula, Montana

                         Submitted on Briefs:  January 20, 2021

                                 Decided:  March 23, 2021

Filed:

                      _____
                                Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Jeffery Patrick Heenan appeals the Fourth Judicial District Court, Missoula County's (District Court) "Findings of Fact, Conclusions of Law, Decree of Dissolution and Order Adopting Parenting Plan" and "Final Parenting Plan." We restate the issues as follows:

> *1. Did the District Court err in its adoption of the final parenting plan, including permitting Wallace to relocate and requiring Heenan's visitation to be supervised?*
>
> *2. Did the District Court err in its division of the marital estate and the determination of child support?*

¶3 We affirm in part, reverse in part, and remand for further proceedings.

¶4 The procedural history of this case is extensive and involves proceedings in multiple venues. Heenan and Wallace met in 2011 and married in June 2016, giving birth to D.H. later that year, while living in Billings. Wallace decided to return to school for physical therapy, and she applied to Idaho State University in Pocatello, Idaho and the University of Montana in Missoula. After Idaho State University accepted Wallace, Heenan and Wallace purchased a foreclosed home in Pocatello for approximately $38,000. During Wallace's pregnancy in 2016, Heenan, with the help of his parents, renovated the Pocatello

home, investing an estimated $21,052 in supplies and labor. Heenan, a flooring contractor, painted walls, removed carpet, repaired plumbing, and replaced the subfloor.

¶5 Wallace elected instead to enroll at the University of Montana, where she had previously been waitlisted. In August 2016, Heenan and Wallace entered a rental lease agreement in Missoula. Heenan paid the monthly rent. A couple weeks later, while Wallace was preparing to move to Missoula, the Billings Police Department responded to a dispute between Heenan and Wallace, reporting that Heenan was intoxicated and had threatened movers with a rifle. Heenan and Wallace agreed to separate for a short period of time. The couple eventually moved to Missoula together, but, in February 2017, they decided to separate permanently.

¶6 On February 27, 2017, Wallace petitioned for a temporary order of protection (TOP) from the Missoula City Municipal Court. Wallace stated she felt threatened and intimidated by Heenan's behavior, alleging he had threatened violence against Wallace and D.H., destroyed property in the Missoula rental, and was verbally abusive towards Wallace, particularly by his claiming that she was mentally ill. The Municipal Court issued an ex parte TOP and hearing notice. After a couple of pleadings and orders, including a continuance, the issue proceeded before the District Court, which set a hearing for June 9, 2017.

¶7 In March 2017, Wallace applied for child support with the Child Support Enforcement Division of the Department of Public Health and Human Services (CSED). Heenan filed this proceeding with the District Court. CSED was not notified of the

3

dissolution proceeding. Heenan's initial attorney withdrew in April 2017, citing a breakdown in communication.

¶8 At the June 9, 2017 TOP hearing, the District Court adopted an interim parenting plan negotiated by new counsel and stipulated to by Heenan and Wallace, effective until July 15, 2017. Under the agreement, Heenan was granted scheduled visitation with D.H., with all communications between Heenan and Wallace to take place on Our Family Wizard, a parenting application. The District Court dismissed the TOP and entered a "Civil No Contact" order in its place, although the oral order did not specify an expiration date. The District Court subsequently memorialized the oral order and scheduled a status hearing for August 17, 2017, and a trial for September 1, 2017. On June 30, 2017, Heenan's attorney withdrew, citing ineffectual communications. Upon an unopposed motion by Heenan's new counsel, the District Court continued the trial until October 20, 2017.

¶9 On September 27, 2017, Heenan and Wallace stipulated to a stay of the dissolution proceedings and the CSED action. Heenan and Wallace agreed that Wallace would remain the primary custodial parent and that a similar visitation schedule with D.H., then 14 months old, would continue. Further parenting issues were to be addressed with attorney Meri Althauser, who conducted a program to resolve parenting issues, and Heenan and Wallace agreed to communicate by text and e-mail. The parties each retained the option of continuing dissolution proceedings. The District Court vacated the schedule. Althauser later sent a letter stating she would no longer assist the parties.

4

¶10    On October 21, 2017, Heenan and Wallace met for their scheduled exchange time at the Missoula Alliance Church. Wallace became upset with Heenan when he asked why D.H.'s diaper was soiled. According to Wallace, Heenan called D.H. "trashy." When Wallace began to leave with D.H., Heenan followed her, and Wallace told him to leave her alone. When their argument created a disturbance, Heenan left and reported the incident to the Missoula Police Department, while Wallace reported the incident to CSED.

¶11    On January 2, 2018, Wallace petitioned for a second TOP, alleging Heenan was stalking, sending messages by text, e-mail, and Our Family Wizard telling Wallace she was mentally ill, and contacting her friends and family to help Wallace realize she was mentally ill. Wallace alleged other violations of the Civil No Contact order by Heenan, including breaking into the Missoula rental, calling Child Protective Services to conduct a wellness check on Wallace, which was later determined to be unsubstantiated, and sending Wallace's neighbor to the Missoula rental as hired help. Wallace requested supervised visitation for Heenan and D.H. The following day, the District Court issued a TOP in Cause No. DR-18-1, requiring Heenan to stay at least 1,500 feet away from the Missoula rental, University of Montana campus, and ASUM Childcare. Heenan was permitted to contact D.H. through supervised visits at Planet Kids in Missoula. The District Court set a hearing for January 22, 2018 and stated that the TOP "shall continue in full force and effect until further order of the court."

¶12    At the hearing, Wallace moved the District Court to continue this matter because she had retained counsel who could not be present. The District Court granted the motion

over Heenan's objection and reset the TOP hearing for February 6, 2018. On February 6, Wallace advised the District Court that the dissolution proceeding, then a separate proceeding, had been stayed, and asked that both matters be continued for three weeks. The District Court granted the motion over Heenan's objection, set a joint hearing for both the dissolution and the TOP for February 23, 2018, and ordered the TOP to remain in effect. At the hearing, Heenan and Wallace stipulated to appointing of Amy K. Lord of Lord Law Office, PC, to serve as a Parenting Coordinator, which the District Court granted. The District Court ordered Lord to implement a temporary parenting plan and to report to the District Court regarding D.H.'s support and parenting.

¶13    In March of 2018, following no objection from Heenan or Wallace to its calculation, CSED ordered Heenan to "pay child support in the amount of $544.00 per month starting in April of 2018." In August 2018, after no payment had been made, CSED seized Heenan's bank account, collecting $1,778.95. Heenan requested an exemption hearing before CSED, which was held on September 24, 2018. CSED was then first made aware of the parties' dissolution proceedings, leading to its ruling:

> Ms. Wallace should have advised the CSED of the dissolution action and the September 2017 [stipulation staying the dissolution and CSED proceedings]. Mr. Heenan also had many opportunities to object to the [Notice and Order Concerning Support] and to advise the CSED of the District Court action. The CSED did not know of the parties' agreement until the recent exemption hearing. The CSED believes that returning half of the seized amount ($889.46) to Mr. Heenan without him having to prove the income is wages, and entering a substitute [temporary order] and vacating the [Notice and Order Concerning Support] appropriately balances various interests.

6

CSED vacated the original support order. Heenan and CSED entered into a stipulation dismissing the exemption proceedings and converting the proceeding to a temporary support matter.[1]

¶14 In early 2019, Heenan moved the District Court to schedule a trial, citing Lord's delay in issuing her recommendations and that Heenan had not seen D.H., then 2 ½ years old, for six months. Lord's recommendations were reported on February 13, 2019, wherein she concluded that "DH appears to have a strong, trusting bond with [Wallace]. It is this parenting coordinator's perspective that this did not occur by accident, but by the consistent, loving care." Lord opined that Heenan "perceives himself to be the victim in his relationships" with Wallace and D.H., and that Heenan believed Wallace

> has systematically manipulated this process against him and believes he has little to no culpability in the lack of contact and relationship he has with DH. To the extent he believes he has no responsibility in creating the negative dynamics, outside of attempting to reconcile prior to this parenting coordinator's involvement, he has also done nothing to proactively address or improve his contact or relationships through any kind of self-work or therapeutic process.

Lord recommended the parties complete co-parenting classes and that Heenan engage in therapy "to assess and address his role in the disrupted relationship he has with DH and his ongoing perceptions he has about [Wallace], with an eye toward reunification with DH."

---

[1] In February 2020, CSED entered a support order requiring Heenan to pay child support in the amount of $200 per month, which was ultimately adopted by the District Court in the decree. Wallace's briefing states that "without objection" the order was "abstracted to the child support case against Jeff in Cause Number DR-18-55, Twenty-First Judicial District, Ravalli County." CSED also calculated an arrearage of $13,480.53.

Lord recommended continued supervised visitation, with increased time for Heenan once Heenan "has consistently exercised" visitation:

> once [Heenan's] counselor determines [Heenan's] unsupervised parenting time poses no risk to DH, this case would be ripe for a more traditional parenting plan. In the meantime, while this parenting coordinator is not in a position to investigate or opine on the necessity of a protective order in this case, it seems appropriate that the court set a hearing to adjudicate the it [sic] on its merits.

Heenan responded on February 21, 2019, by filing a "Notice of Inaccuracies" objecting to Lord's findings, including that he had "thus far stipulated to" the second temporary order of protection, as Lord indicated. Heenan asserted Lord had only arranged visitation with D.H. in locations prohibited under the TOP, and then faulted him for "not violating the temporary order of protection in order to see his daughter."[2]

¶15 Lord also noted a "recent development" that Wallace's standing with the University of Montana had come into question due to her dismissal from the physical therapy program.[3] On March 29, 2019, Wallace filed a notification that, pursuant to § 40-4-217, MCA, she intended to "change her place of residence and that of her child as soon as practical" from the Missoula rental to the parties' Pocatello home. In a filing on March 11,

---

[2] This filing was later amended by an affidavit from Heenan that asserted the Billings gun incident occurred because he was "unexpectedly awakened by two (2) men carrying his furniture," with no prior notice from Wallace. Heenan denied he struggles with alcohol abuse, contrary to Wallace's assertion that both she and Heenan struggle with alcohol. Heenan also asserted that Wallace unjustifiably refused to allow Heenan install laminate flooring at the Pocatello house, only to later pay to have them installed by a third-party. At trial, Lord disagreed she had arranged for visitation at places prohibited by the TOP.

[3] This educational matter was pending on appeal with the University of Montana at the time of trial.

2019, Heenan had advised that the following issues were pending before the District Court: 1) a parenting plan, 2) an equitable property settlement, 3) the final amount of child support, and 4) the temporary order of protection; then, on April 12, Heenan also objected to Wallace's intended move.

¶16 On May 23, 2019, the District Court set a "one (1) day trial" for October 4, 2019 at 9:00 a.m. Heenan requested the trial time be extended because his attorney was scheduled to testify in an unrelated case on the same day, so on September 24, 2019, the District Court ordered the trial to commence at 10:00 a.m. As the trial opened, the District Court stated:

> So as you know, I granted a motion to start the hearing an hour later. That's going to somewhat restrict the amount of time we have for testimony. So I'm going to give each counsel 50 minutes for testimony.
>
> At the end of the case, based upon my review of the file, the main thing I'm going to need to hear, based on where I see the lines of battle, is interplay between your testimony and the Montana Supreme Court case precedent addressing notice of intent to move as it relates to the constitutional right to travel. That is where I see the fault lines, in the case, based upon everything you've filed.
>
> .   .   .
>
> It's going to be 50 minutes per side, which is going to allow me to entertain a small amount of oral argument at the end.
>
> And then what I plan to do is make a ruling, from the bench, in terms of findings, conclusions, and order. And I'm going to ask the - - the prevailing party to give me orders electronically so we can keep things rolling.

Before testimony, Heenan's counsel summarized:

> So, Your Honor, I think, in this case, the issues are an appropriate parenting plan, and we have Amy Lord here to testify to that. We also have the issue of the temporary restraining order, whether that should be vacated. We'd also have the issue of child support, which was reserved pursuant to a

stipulation with CSED. And then we have the issue of the house in Idaho and what should be done with that.

¶17     Heenan, Lord, Cecilia Totten, who is Wallace's mother, and Alex Nixon, a character witness for Heenan, testified. Wallace's counsel discussed Wallace's plan to move to Pocatello, including that Wallace had already lined up a counselor there and would resume counseling as soon as she could move, that she would follow all recommendations made by her current counselor, and utilize FaceTime for visitations between Heenan and D.H. The District Court concluded the hearing at noon:

> As I was reviewing the file, I thought we were going – I thought the lines of battle were going to be whether or not there was going to be a move, and there's so much underlying tension and challenges to be dealt with that occupied the entire time. Further, we had to truncate the hearing due to [Heenan's attorney's] obligation in another department.
>
> .   .   .
>
> I want to tell you what the interim orders are going to be. I'm going to order both parties to submit your proposed findings and conclusions . . . one week from today. I want to get the interim parenting plan issued quickly. I'm going to order simultaneous briefing. . . . I'll set a page limit, ten pages per party. The two issues I want to hear about are the implications of the constitutional right to travel, in a family law case, and the governing case standards for modifying child support arrearages.
>
> I'm going to set a status hearing in early to mid-December. . . . I'm going to want to hear how everyone's living with the interim parenting plan by then.
>
> And in my written order from this hearing, I'm going to set a final hearing to clean up any remaining business. That will happen at - - either in late February or early March, depending on my other obligations.
>
> So I had hoped we - - we were going to be coping with a smaller list of issues for today. That's as much progress as we can make, given the fact that the scope of the issues was somewhat larger, and we had to shave off an hour out of respect for a proceeding in another department in this district.

10

¶18    On May 19, 2020, despite acknowledging an insufficiency of time to address the issues and indicating "a final hearing" would be held to "clean up any remaining issues," the District Court entered findings of fact, conclusions of law, decree and a Final Parenting Plan that ostensibly decided all pending issues.  The District Court did not address the second TOP, but relied upon it in the parenting plan, citing it as one reason supervised visitation between Heenan and D.H. remained necessary.  The District Court found it was in D.H.'s best interest to primarily reside with Wallace, and permitted Wallace to relocate to Pocatello with D.H.  The District Court awarded Wallace a 65% interest and Heenan a 35% interest in the Pocatello home, stating the division was made "in lieu of any maintenance award," but providing no analysis of maintenance or apportionment, or a mechanism for how the parties would obtain their respective interests in the home.  Finally, the District Court ordered Heenan to "pay the child support in the amount determined by the CSED in February of 2020 of $200 per month from that date onward, and the full back support amount of $13,480.53, which began accruing prior to the stipulated stay between the parties."

¶19    Heenan appeals.  Following withdrawal by his trial counsel, Heenan initiated the appeal to this Court pro se in June of 2020.  He subsequently obtained new counsel.

¶20    This Court generally reviews issues in dissolution actions for an abuse of discretion. *In re Marriage of Elder & Mahlum*, 2020 MT 91, ¶ 10, 399 Mont. 532, 462 P.3d 209 (apportionment of marital property) (citations omitted); *In re Solem*, 2020 MT 141, ¶ 6, 400 Mont. 186, 464 P.3d 981 (parenting plan) (citations omitted); *In re Marriage of Banka*,

11

2003 MT 84, ¶ 13, 315 Mont. 97, 67 P.3d 885 (child support) (citations omitted). A trial court abuses its discretion when it exercises granted discretion based upon clearly erroneous findings of fact,[4] erroneous conclusions or application of law,[5] or acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason resulting in substantial injustice. *In re Elder*, ¶ 10 (citations omitted).

¶21    *1. Did the District Court err in its adoption of the final parenting plan, including permitting Wallace to relocate and requiring Heenan's visitation to be supervised?*

¶22    As an initial matter, Heenan argues the District Court's management of the hearing process and entry of "Findings of Fact, Conclusions of Law, Decree of Dissolution and Order Adopting Parenting Plan" and "Final Parenting Plan" without conducting a final hearing compromised the fairness of the proceeding and violated his right to due process, undermining the District Court's rulings on all issues. He also challenges the sufficiency of the District Court's findings to support its rulings. Acknowledging the hearing was "truncated," Wallace responds that the District Court nonetheless was presented with substantial credible evidence to support its findings.

---

[4] M. R. Civ. P. 52(a)(6). Findings are clearly erroneous if not supported by substantial evidence, *Interstate Prod. Credit Ass'n v. Desaye*, 250 Mont. 320, 323, 820 P.2d 1285, 1287 (1991), meaning "evidence that a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Fiedler v. Fiedler*, 266 Mont. 133, 138, 879 P.2d 675, 678 (1994). We leave factual findings undisturbed if supported by substantial evidence, the trial court has not "misapprehended the effect" of the evidence, and the Court is not left with a "definite and firm conviction that a mistake has been committed." *Richards v. Trusler*, 2015 MT 314, ¶ 12, 381 Mont. 357, 360 P.3d 1126 (citing *Desaye*, 250 Mont. at 323, 820 P.2d at 1287) (brackets and quotations omitted).

[5] Reviewed for correctness. *Giambra v. Kelsey*, 2007 MT 158, ¶ 28, 338 Mont. 19, 162 P.3d 134 (citations omitted).

¶23 Trial courts are faced with difficult challenges in the administration of heavy caseloads. Limitation upon the length of case presentation is a necessary management tool and is commonly employed. We recognize that trial courts have, and must have, "broad discretion to oversee trial administration," and are "in the best position to consider the most fair and efficient procedure to conduct the litigation." *In re Marriage of Williams*, 2018 MT 221, ¶ 22, 392 Mont. 484, 425 P.3d 1277. In balance, "[d]ue process requires notice and the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Steab v. Luna*, 2010 MT 125, ¶ 22, 356 Mont. 372, 233 P.3d 351 (citation omitted). We agree with Wallace that the District Court, as it intended, received substantial evidence during the hearing on the parenting plan, particularly regarding Wallace's move to Pocatello, and we address those issues below. However, Heenan makes a compelling argument that his opportunity to present the remainder of his case was eliminated in contradiction to the District Court's instructions and his reasonable expectations. While we loath requiring further proceedings in a small marital estate, this due process concern, combined with insufficient findings in several regards, requires us to conclude that further proceedings are necessary, and we remand on those issues, as explained herein.

¶24 Regarding the parenting plan, Heenan does not directly challenge the District Court's determination that it is in D.H.'s best interest for D.H. to primarily reside with Wallace but takes issue with Wallace's relocation to Pocatello and challenges the imposition of supervised visitation. On the latter question, citing § 40-4-218(2), MCA, Heenan argues that the District Court failed to make findings that supervised visitation

13

furthers D.H.'s "physical health [or] emotional development," and that this is not an "extraordinary circumstance" justifying supervision restrictions. "A district court has broad discretion when considering the parenting of a child, and we must presume the court carefully considered the evidence and made the correct decision." *In re Solem*, ¶ 6 (citing *In re G.M.N.*, 2019 MT 18, ¶ 11, 394 Mont. 112, 433 P.3d 715).

¶25 The District Court found that "evidence was presented regarding the physical abuse or threat of physical abuse" by Heenan against Wallace, and that "credible evidence was presented [of] instances of heavy drinking" by Heenan. The District Court noted that Heenan had a "disrupted relationship" with D.H. and had failed to exercise parenting time when he had the opportunity, despite Heenan's protestations about visitation arrangements. By the time of trial, Heenan had not visited D.H., who was then 3 years old, in about 16 months. The District Court entered its reasons for imposing an initial program of supervised visitation within the parenting plan, which it also expressly incorporated into the decree, including its concern about the "allegations of physical and/or emotional safety and family violence." The District Court also reasoned that "an Order of Protection has been issued," which Heenan challenges as having never had a hearing and having expired as a matter of law. It is correct the District Court did not address the status of the long-pending TOP within the dissolution decree, and we must presume it is not currently valid for lack of requisite process. However, that does not alter the fact that the TOP was previously issued in the proceeding and continued over many months upon the parties' stipulation to remain in effect pending Lord's recommendations. Consequently, it was a

14

factor appropriately considered by the District Court in determining to impose supervised visitation. It should be noted that the District Court also provided a process for supervised visitation to terminate after Heenan exercises time with D.H. and a determination by counsellors that "unsupervised parenting time poses no risk to D.H." We would think that Heenan would be anxious to reinitiate visitation with D.H., demonstrate his good faith and maturity under an initial period of supervision, and advance in his relationship with D.H. over time. He has that opportunity, as does Wallace to demonstrate she will cooperate with Heenan's visitation as promised. We therefore conclude the statutory requirements were satisfied and that the District Court did not abuse its discretion by ordering that Heenan would reinitiate his visitation with D.H. under a program of supervision.

¶26 Next, when a parent desires to relocate, courts must consider competing constitutional rights (e.g., right to travel vs. right to parent) reconciled with a state's compelling interest to further the best interest of the child. *In re Solem*, ¶¶ 9-12 (citations omitted). We have explained:

> A restriction on a parent's fundamental right to travel must be imposed cautiously and only where there is sufficient proof that the restriction is in the best interests of the child. The parent seeking the restriction must provide case-specific proof that the restriction is in the child's best interest: that is, legitimate, case-specific reasons and evidence pertaining to the particular child, rather than general discussion about the effects of relocation on children of separation or divorce.

*In re M.C.*, 2015 MT 57, ¶ 14, 378 Mont. 305, 343 P.3d 569 (citations and quotations omitted).

¶27    Heenan correctly notes that the District Court did not provide a balancing analysis of the parties' constitutional rights. However, the District Court ordered post-trial briefing on the issue, and it is clear that the District Court considered the impacts of the move. After de novo review of the constitutional principles at issue, we conclude upon this record that the District Court's failure to provide the additional legal analysis in this case was harmless error. The factual backdrop here strongly supports the District Court's decision. The District Court found that Wallace "provides continuity and stability of care" for D.H., as well as the child's "development needs." At the hearing, Wallace's mother provided a firsthand account regarding D.H.'s life in Pocatello:

> [Wallace] wants to move to Pocatello because that's where her house is and it - - it would be the least expensive place for her to live. And she's traveled back and forth to Pocatello with D.H., and I've gone a couple of times and D.H. sees it as - - as her home.
>
> .    .    .
>
> [T]hey have already put in a little garden. And D.H., right when we got there, she hopped to the backyard, got the hose out, and she started watering her plants and telling me about her plants and just showed me, again, her room, and, you know, just how she was going to put her toys in there when she moved there. She's already mentally prepared herself for being there.

¶28    The clear determination that Wallace must be the primary physical custodian and that Heenan did not have a consistent relationship with D.H., requiring supervised visitation, weighs strongly in favor of Wallace's constitutional right to relocate with D.H. Relying mostly on general child development research, Heenan offers little of "case-specific proof that the restriction [upon relocation] is in the child's best interests," *In re M.C.*, ¶ 14, particularly in light of D.H.'s lack of significant visitation with Heenan in

16

the recent past. As the District Court noted, "[Wallace's] move would limit contact with [Heenan], who has had limited contact with the minor child while living within easy driving distance." Heenan's initiation of limited, supervised visitation with D.H. can be effectively accommodated despite the distance. We conclude that, although its analysis was insufficient, the District Court did not commit reversible error by granting Wallace's request to move to Pocatello.

¶29 *2. Did the District Court err in its division of the marital estate and the determination of child support?*

¶30 The District Court apportioned the most significant asset of the marital estate, the Pocatello home, by distributing 65% to Wallace and 35% to Heenan. The District Court offered no findings or rationale for this determination other than to say that it was made "in lieu of any maintenance award." No specific findings were entered about the statutory factors regarding eligibility for maintenance under § 40-4-203, MCA, the value of the property, other marital properties or the parties' debts, or the property apportionment factors under § 40-4-202, MCA. The District Court noted that Heenan and his immediate family invested into the foreclosed property yet said nothing about the weight or consideration given to that investment. The order made no provision concerning how the parties would obtain their respective interests in the house. *See Schwartz v. Harris*, 2013 MT 145, ¶ 35, 370 Mont. 294, 308 P.3d 949 (recognizing that a district court "fail[ed] to provide a sufficient framework for implementing the distribution of the estate.") Any possibility that the Pocatello home could assist in resolution of any child support arrearage was apparently not considered. While findings about each of the various statutory factors

17

are not necessarily required in every case, "[f]indings must be sufficient, however, to permit review without speculation into a district court's reasoning," *Crowley v. Crowley*, 2014 MT 42, ¶ 26, 374 Mont. 48, 318 P.3d 1031. Here, we are unable to determine whether the District Court properly considered the governing factors or otherwise erred in apportioning the marital estate.

¶31 Regarding child support, which the parties had reserved upon a stipulation with CSED, Heenan argues his trial attorney "was notified" and "prepared for a one-day trial," and adds:

> [T]he District Court erred by determining arrears without conducting [a] final and complete hearing. [Heenan's attorney] expressly clarified the parties had reserved the arrears issue for the District Court's determination. The District Court expressly acknowledged the issue. Cutting the October 4, 2019 hearing short, the Court assured a full, complete, and final hearing would be ordered for a later date. However, the Court never did so, thus depriving [Heenan] of a meaningful opportunity to be heard on the issue.

¶32 The record supports Heenan's contentions. The trial was scheduled for one day, then was shortened to two hours on the morning of trial, with 50 minutes allotted to each side to present their case. Heenan's trial counsel, Mars Scott, said, "I can move pretty fast, Your Honor, but I am a little concerned. But I will move really, really fast, but I think I might need more time than 50 minutes." Wallace's trial counsel, Klaus Sitte, explained that Patrick Quinn, legal counsel for CSED, was present to testify regarding the reserved child support issue. The District Court noted that the support question was an "intriguing" issue, but time did not permit Quinn to be called. A "final hearing" was promised "to clean up any remaining business," but, without further notice, a final decree was entered.

18

¶33 We cannot help but be concerned that due process was not fully afforded under these circumstances and believe remand is necessary for supplemental proceedings on the financial issues, including the distribution of the marital estate and child support. On remand, the District Court need not discard the evidence already taken or the findings entered except as warranted upon such supplemental proceedings that are necessary for the parties to reasonably complete their presentations, and for entry of sufficient findings for review.

¶34 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. This appeal presents no constitutional issues, no issues of first impression, and does not establish new precedent or modify existing precedent. In the opinion of the Court, the case presents questions controlled by settled law or by the clear application of applicable standards of review.

¶35 Affirmed in part, reversed in part, and remanded for further proceedings consistent herewith.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ DIRK M. SANDEFUR
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER