Justice Ingrid Gustafson delivered the Opinion of the Court.
***114 ¶1 Shawnna McLaughlin (Shawnna) appeals from the Amended Findings of Fact, Conclusions of Law and Order Re: Respondent's Notice of Intent to Relocate issued November 1, 2017 by the Standing Master in the Eighteenth Judicial District Court and affirmed on March 19, 2018 by the District Court. The parenting plan contained therein provides for the parties' child to reside on a primary basis in Montana. We affirm.
¶2 We restate the issue on appeal as follows:
Did the District Court abuse its discretion in ordering the parenting plan which provides for the child to continue to reside on a primary basis in Montana?
*717 FACTUAL AND PROCEDURAL BACKGROUND
¶3 Shawnna and Robert "Brent" Northcutt (Brent) met in Boston, Massachusetts where Shawnna was residing when the parties began their relationship. Shawnna moved to Bozeman in January 2011 to reside with Brent. Although they never married, they resided together in Bozeman until they separated in May 2013. During the time they lived together they had a child, G.M.N., born in July 2011. Brent has another daughter, A.N., from a prior relationship. Brent has had sole custody of A.N. since she was one and one-half years old, and she is now a teenager. A.N. resided with Brent and Shawnna during their entire relationship. A.N. and G.M.N. are very close. G.M.N. resided continuously with A.N. from her birth until the parties separated and since then they frequently spend time together during Brent's parenting time.
¶4 On July 30, 2014, the parties entered into a written Stipulated Final Parenting Plan. That plan provided for a two-week rotating schedule, where during Week 1, Brent parented G.M.N. from Tuesday at 6:00 p.m. until Friday at 7:00 a.m., and during Week 2, Brent parented G.M.N. from Thursday at 6:00 p.m. until Sunday at 4:00 p.m. Shawnna and Brent both testified that Brent parents G.M.N. more time than the Stipulated Parenting Plan provides. Both also testified the other was a good parent and had a strong relationship with G.M.N. Given that G.M.N. is in school on a full-time basis and the parties two-week rotating schedule, the time the parties actually spend with G.M.N. when she is awake before and after school and on weekends is nearly equal. The Standing Master found that, "the parties share nearly equal parenting time."
¶5 In considering each parent's relationship with G.M.N., the Standing Master found "both parents are actively involved in [G.M.N.'s] care and upbringing." Most importantly, based on the ***115 evidence presented at hearing the Standing Master concluded the emotional support and consistency and stability of care each parent provided G.M.N. was substantially equal- G.M.N. had a strong bond with Shawnna and a strong bond with Brent, A.N., and Janelle (Brent's girlfriend)-and it was in G.M.N.'s best interests to have frequent and continuing contact with both families.
¶6 Both Shawnna and Brent have specialized occupations. Shawnna worked as a trauma and then an ER nurse prior to moving to Montana. In Montana, Shawnna worked as an ER nurse in Livingston for 6 to 8 months, but her primary work has been as an ER charge nurse for Bozeman Deaconess Hospital (BDH) from November 2012 until September 16, 2016. Shawnna's employment with BDH was terminated after a dispute with BDH which resulted in a Settlement/Non-Disclosure Agreement which prohibits her from future employment with BDH or its owned affiliates in Big Sky and Bozeman. Brent works as a MySQL database engineer with Oracle. Given the specialty of his work, there are few locations where he could work. In the past, he has received other job offers to relocate to Silicon Valley or Seattle but he has turned them down to remain in Bozeman to be close to G.M.N. Although he generally works 7:30 a.m. to 4:30 p.m., his work schedule is flexible and he can work from home when needed to accommodate the needs of his children.
¶7 Although Brent believes Shawnna to be a good mother, he does not trust her. Brent testified and Shawnna admitted that after her termination from BDH Shawnna did not tell Brent she had lost her job. Not only did she not tell him, she lied to him that she continued to be employed at BDH. Shawnna also did not tell Brent she received a DUI in February 2016, resulting in suspension of her driver's license. At the time she received the DUI, she was exercising parenting time with G.M.N., who was with a babysitter. After being arrested and released, she went home and cared for G.M.N. As a result of the DUI, Shawnna's driver's license was suspended and at the hearing she testified she expected it to be reinstated on March 27, 2017.
¶8 Shawnna now desires to move to Boston to live closer to family and where she believes she will have better employment opportunities. She desires G.M.N. to move with her. After being terminated from her employment, Shawnna sought employment with *718 only three places in the Bozeman area, one of which she declined to attend a telephone interview and instead elected to have lunch with girlfriends. Shawnna admitted there is a part-time ER nurse position available in Livingston where she worked before and there are 3 or 4 private urgent cares in Bozeman and Belgrade but she has not sought employment with them. ***116 Shawnna also admits she did not seek employment closer to Bozeman in Billings or Missoula and admitted there are ER nurse positions available in Billings.
¶9 Finally, rather than discussing her potential move with Brent, Shawnna instead filed a Notice of Intent to Relocate. Brent learned of her desire to move when he was served with the Notice. Brent objected and a hearing was held before the Standing Master on March 17, 2017, following which the Standing Master issued her Findings of Fact, Conclusions of Law and Order denying Shawnna's request to relocate with G.M.N. Shawnna then filed a Notice of Specific Objections and Request for Review, after which the Standing Master issued an Amended Findings of Fact, Conclusions of Law and Order Re: Respondent's Notice of Intent to Relocate on November 1, 2017. Shawnna filed new specific objections and request for review, on which the District Court held a hearing in March 2018. On March 19, 2018, the District Court affirmed the Standing Master's November 1, 2017, amended order denying Shawnna's request to relocate with G.M.N., from which Shawnna now appeals. Additional facts will be referenced in the discussion below.
STANDARD OF REVIEW
¶10 In a case tried before a standing master, we apply the same standard of review to an adopted master's findings as we do to a district court's. Patton v. Patton , 2015 MT 7, ¶ 17, 378 Mont. 22, 340 P.3d 1242. We review the underlying findings in support of a districts court's decision regarding modification of a parenting plan under the clearly erroneous standard. Guffin v. Plaisted-Harman , 2010 MT 100, ¶ 20, 356 Mont. 218, 232 P.3d 888 ( Guffin II ). We review a district court's conclusions of law to determine if they are correct. In re the Parenting of C.J ., 2016 MT 93, ¶ 12, 383 Mont. 197, 369 P.3d 1028.
¶11 A district court has broad discretion when considering the parenting of a child, and we must presume the court carefully considered the evidence and made the correct decision. In re C.J. , ¶ 13 (citation omitted). It is not this Court's function to reweigh conflicting evidence or substitute its judgment regarding the strength of the evidence for that of the district court. In re A.F. , 2003 MT 254, ¶ 24, 317 Mont. 367, 77 P.3d 266. Rather, the ultimate test for adequacy of findings of fact is whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision, and whether they are supported by the evidence presented. In re Marriage of Wolfe , 202 Mont. 454, 458, 659 P.2d 259, 261 (1983). Accordingly, absent clearly erroneous findings, we will not disturb a district court's decision ***117 regarding a parenting plan unless there is a clear abuse of discretion. In re C.J. , ¶ 13.
DISCUSSION
Did the District Court abuse its discretion in ordering the parenting plan which provides for the child to continue to reside on a primary basis in Montana?
¶12 Cases involving a proposed relocation of a parent with a child are difficult as they are rarely amenable to compromise and involve balancing a parent's right to resettle in another location, protecting the best interests of the child, and the competing rights of the other parent. Although the mother has a constitutional right to travel and relocate, this right does not outweigh the father's right to have regular and ongoing parental contact with his daughter and the child's right to a relationship with her father. E.g. , In re M.C. , 2015 MT 57, ¶ 8, 378 Mont. 305, 343 P.3d 569. In cases where a parent is exercising her right to travel, as is the case herein, the Court must try to reconcile the interests of both parents with the best interests of the child.
¶13 Shawnna asserts the District Court erred in denying her request to relocate to Boston with G.M.N. She asserts Brent failed *719 to provide legitimate, case-specific reasons and evidence that it is not in G.M.N.'s best interests to relocate with Shawnna to Boston. From review of the record, we do not find these assertions persuasive.
¶14 In pertinent part, § 40-4-212, MCA, provides:
(1) The court shall determine the parenting plan in accordance with the best interest of the child. The court shall consider all relevant parenting factors, which may include but are not limited to:
(a) the wishes of the child's parent or parents;
(b) the wishes of the child;
(c) the interaction and interrelationship of the child with the child's parent or parents and siblings and with any other person who significantly affects the child's best interest;
(d) the child's adjustment to home, school, and community;
(e) the mental and physical health of all individuals involved;
(f) physical abuse or threat of physical abuse by one parent against the other parent or the child;
(g) chemical dependency, as defined in 53-24-103, or chemical abuse on the part of either parent;
(h) continuity and stability of care;
(i) developmental needs of the child;
(j) whether a parent has knowingly failed to pay birth-related ***118 costs that the parent is able to pay, which is considered to be not in the child's best interests;
(k) whether a parent has knowingly failed to financially support a child that the parent is able to support, which is considered to be not in the child's best interests;
(l) whether the child has frequent and continuing contact with both parents, which is considered to be in the child's best interests unless the court determines, after a hearing, that contact with a parent would be detrimental to the child's best interests. In making that determination, the court shall consider evidence of physical abuse or threat of physical abuse by one parent against the other parent or the child, including but not limited to whether a parent or other person residing in that parent's household has been convicted of any of the crimes enumerated in 40-4-219(8)(b).
(m) adverse effects on the child resulting from continuous and vexatious parenting plan amendment actions.
¶15 In pertinent part, § 40-4-219, MCA, provides:
(1) The court may in its discretion amend a prior parenting plan if it finds, upon the basis of facts that have arisen since the prior plan or that were unknown to the court at the time of entry of the prior plan, that a change has occurred in the circumstances of the child and that the amendment is necessary to serve the best interest of the child. In determining the child's best interest under this section, the court may, in addition to the criteria in 40-4-212, also consider whether:
(a) the parents agree to the amendment;
(b) the child has been integrated into the family of the petitioner with consent of the parents;
(c) the child is 14 years of age or older and desires the amendment;
(d) one parent has willfully and consistently:
(i) refused to allow the child to have any contact with the other parent; or
(ii) attempted to frustrate or deny contact with the child by the other parent; or
(e) one parent has changed or intends to change the child's residence in a manner that significantly affects the child's contact with the other parent.
¶16 In her Amended Findings of Fact, Conclusions of Law and Order Re: Respondent's Notice of Intent to Relocate, the Standing Master detailed her consideration of each of the factors referenced in ***119 §§ 40-4-212 and -219, MCA.[1] The Court specifically *720 found that G.M.N. is too young, then at age five, to rely heavily on her wishes. Both parents desired G.M.N. to reside with them on a primary basis upon Shawnna's relocation to Boston. The Standing Master conscientiously considered G.M.N.'s interaction and interrelationships with her parents, siblings, and with other persons, namely Janelle, who significantly affect G.M.N.'s best interests. It is not disputed that in addition to her close relationships with Shawnna and Brent, G.M.N. has a very close relationship with her half-sister A.N. as well as with Brent's girlfriend Janelle. The Standing Master found G.M.N. to have four primary relationships-with Shawnna, Brent, A.N., and Janelle.
¶17 The Standing Master found Brent and Shawnna to be equal co-parents in terms of providing relational support and both equally able to provide continuity and stability of care for G.M.N. In considering the best interest factors under § 40-4-212, MCA, the Standing Master concluded the "factors are balanced fairly evenly in favor of either Mother or Father being primary residential custodian of G.M.N." If G.M.N. relocated to Boston her contact and interaction with three of her four closest relationships would be significantly reduced, whereas if she remained in Bozeman her contact and interaction with only one of her four closest relationships would be significantly affected. The Standing Master found that although G.M.N. "is easily adaptable, she is very connected and well-adjusted to her home, school, and community in Montana." Although Shawnna testified to having a large extended family in the Boston area, the Standing Master specifically considered this and did not give it much weight noting that G.M.N. has never been to Boston, has only briefly met two of Shawnna's extended family, and "has not developed any significant ties" with Shawnna's family. Shawnna herself admitted G.M.N. has school and neighborhood friends in Montana with whom she is closely connected. The Standing Master's finding, "G.M.N. is well-adjusted to her life in Montana and has created emotional ties with family and friends that currently do not exist for her in Boston," is supported by the record.
¶18 The Standing Master considered the living situation of the parties.
***120 Brent continues to reside in Bozeman. He and Janelle purchased a home together approximately a year prior to the hearing. He and Janelle considered purchasing a home closer to Belgrade where Shawnna resides but decided that it would be better to maintain A.N. in her current school. This way neither A.N. nor G.M.N. had to change schools-G.M.N. could remain in her school as Shawnna was residing in the district and had given Brent no indication she intended to relocate. Had they known of Shawnna's proposed move, it may have altered his and Janelle's decision as to where to purchase their home. While Shawnna asserts she believes there would be better employment opportunities for her in Boston, she has not secured work there nor made specific housing arrangements. Shawnna desires to be an ER nurse but testified she worked in other areas of nursing prior to becoming an ER nurse and it would be possible for her to obtain other employment as a nurse. The Standing Master recognized Shawnna would have increased employment opportunities in Boston and carefully considered Shawnna's efforts to obtain employment in the Bozeman area and in Montana, finding she had only applied to three Bozeman area positions and had declined to participate in an offered interview with one, electing instead to go to lunch with girlfriends. Further, she has not sought employment with urgent care facilities not owned by BDH in the Bozeman area.
¶19 Although neither parent has willfully or consistently frustrated or denied the other parent contact with G.M.N., Shawnna's failure to inform Brent regarding both her termination from employment and her conviction for DUI and resultant suspension of her driver's license raised concerns with the Standing Master regarding Shawnna's ability to care for G.M.N. and G.M.N.'s stability in life should G.M.N. relocate with Shawnna to Boston.
*721 ¶20 Shawnna misconstrues the findings and conclusion of the Standing Master and District Court in her conclusion that the Standing Master and District Court failed to presume Shawnna would move and to then consider G.M.N.'s best interests. Shawnna further asserts the Standing Master failed to consider the "heavy burden" on Brent to provide sufficient proof that a travel restriction is in the best interest of G.M.N. as required by our holdings in Guffin v. Plaisted-Harman , 2009 MT 169, ¶ 9, 350 Mont. 489, 209 P.3d 225 ( Guffin I ); Guffin II , 2010 MT 100, 356 Mont. 218, 232 P.3d 888 (collectively, Guffin ); and In re Custody of D.M.G. , 1998 MT 1, ¶ 31, 287 Mont. 120, 951 P.2d 1377. Upon thorough consideration of the §§ 40-4-212 and -219, MCA, factors, the Standing Master determined it was in G.M.N.'s best interests to continue to reside on a primary basis in her home ***121 community of Bozeman/Belgrade, Montana where she has lived since her birth.
¶21 The situation here is far different than that of Guffin or D.M.G . In Guffin, prior to their marriage both parties spent their lives in Kalispell, Montana, they got married in Kalispell in 2001, and then had two children in Kalispell. In February 2006, the parties moved to Terry, MT for father to pursue different work. Guffin I , ¶ 3. The parties separated in September 2007, and in November 2007, father quit his job and moved two hours away from mother and the children to Ekalaka, Montana. Guffin II , ¶ 2. In February 2008, the parties filed a joint parenting plan which the court adopted whereby the children resided with mother on a primary basis and thereafter the children did in fact reside on a primary basis with mother. Guffin II , ¶ 3. In March 2008, mother told father she intended to move back to Kalispell but did not provide written notice of this intention. Guffin II , ¶ 4. In June 2008, mother moved back to Kalispell. At the end of father's summer parenting time, he moved to amend the parenting plan faulting mother for providing him only oral, not written notice, of her intention to move. In granting father's request to amend the parenting plan, the district court explicitly stated mother should have to "pay the price" of reduced parental contact since she was the one who decided to move to Kalispell. Guffin II , ¶ 5. Upon appeal, this court reversed, holding mother had a constitutional right to travel and could not be penalized for exercising this right and confirming "[a]ny decision as to custody of the children must be based upon a careful examination of what is in their best interests." Guffin I , ¶¶ 11-12.
¶22 Upon remand the district court found mother to be a fit parent with supportive family in Kalispell and that the children had a positive relationship with mother's boyfriend. Guffin II , ¶ 25. The district court did not conclude either parent's location would have any significant advantages or disadvantages for the children. Guffin II , ¶ 10. Instead, the district court again concentrated on mother's "unilateral" decision to move, the timing of her decision to move, and her failure to follow the written notice requirement of § 40-4-217, MCA, rather than the best interests of the children. Guffin II , ¶ 29. The district court again amended the parenting plan to designate father as the primary custodial parent. Guffin II , ¶ 7. Upon appeal, this court again reversed, holding the determination of a parenting plan should focus solely on the best interests of the children and consideration of a parent's decision to relocate may not be held against the parent unless it exemplifies a willful and consistent attempt to frustrate or deny the other parent contact with the children. Guffin II , ¶ 33.
***122 ¶23 In D.M.G. , mother and father never married but had twin boys. When the boys were born mother quit her job, stayed home, and became the boys' primary caregiver, although father was actively involved with the boys. In re Custody of D.M.G. , ¶ 2. When mother and father separated, mother moved with the boys to Oregon for better job opportunities and to be closer to her mother and other family. Father did not initially object to mother moving with the boys. In re Custody of D.M.G. , ¶ 3. The district court determined it was in the children's best interests to require mother to relocate back to Montana or, failing to do so, she would lose her status as the primary physical custodian of the children. In re Custody of D.M.G. , ¶¶ 1, 7. In reversing the district court, this Court held the mother enjoyed a constitutional right to *722 interstate travel, and the father had failed in his burden to provide legally sufficient proof that the best interests of the parties' children would be best served by requiring the mother to relocate back to Montana. We determined the district court failed to apply § 40-4-212(3)(a), MCA, which established a presumption in favor of the preexisting custodial parent.[2] In re Custody of D.M.G. , ¶ 43.
¶24 Unlike Guffin and D.M.G ., this case does not involve a situation where the moving parent was determined to be the primary parent. Here, the Standing Master determined both parties to have equally strong relational ties with G.M.N. and to be good parents each equally capable of meeting all the daily demands of parenting. As G.M.N. is in school on a full-time basis and given the parties two-week rotating schedule with Brent having some additional time with G.M.N., the time the parties actually spend with G.M.N. when she is awake before and after school and on weekends is nearly equal. The Standing Master properly concluded Brent and Shawnna parent G.M.N. on a near equal basis, are equally bonded with G.M.N. and are equally able to parent and meet G.M.N.'s needs. More importantly, rather than punishing Shawnna for her impending relocation the Standing Master carefully considered the best interest factors under §§ 40-4-212 and -219, MCA. The Standing Master's findings and conclusions indicate G.M.N. has no real ties to Boston or to relatives there but significant relationships in her home community in Montana.
¶25 While a parent cannot be penalized for moving, this does not preclude a court from considering the impact the move has on the best interests of the child regarding the factors in §§ 40-4-212 and -219, MCA. E.g. , ***123 In re Marriage of Williams , 2018 MT 221, ¶ 19, 392 Mont. 484, 425 P.3d 1277. The Standing Master and District Court did not punish Shawnna for moving, but rather appropriately considered Shawnna's decision to move, her motivation therefor, and her efforts at securing work closer to Bozeman in addition to considering G.M.N.'s best interests under the § 40-4-212, MCA, best interest factors and the additional best interest considerations set forth in § 40-4-219, MCA. Although the Standing Master considered G.M.N.'s relationship with Shawnna to be strong and recognized that increased work opportunities existed for Shawnna in Boston, the Standing Master found these factors did not override or outweigh the considerable benefits to G.M.N. of remaining on a primary basis in the Bozeman area, especially in light of her very positive relationships with Brent, A.N., and Janelle.
¶26 In sum, Shawnna does not really disagree with the facts found by the Standing Master, but rather disagrees with her interpretation of those facts. Shawnna urges us to substitute her interpretation of the facts to find the Standing Master and, in turn, the District Court abused their discretion. We decline to do so. A standing master has broad discretion when considering the parenting of a child, and we must presume she carefully considered the evidence and made the correct decision. In re C.J. , ¶ 13. The Standing Master appropriately considered and weighed the evidence presented and the conflicting perceptions and testimony presented and made findings of fact supported by the evidence and her conclusions of law were correct. It is not this Court's function to reweigh conflicting evidence or substitute its judgment regarding the strength of the evidence for that of the standing master. In re A.F. , ¶ 24. Further, the District Court applied the correct standard of review to the Standing Master's findings of fact and conclusions of law.
CONCLUSION
¶27 We conclude the Standing Master's findings are sufficiently comprehensive and pertinent to the issues, comprehensively set forth the basis for the decision, are supported by the evidence presented, and are not clearly erroneous. The Standing Master's conclusions of law were correct. The Standing Master employed conscientious judgment *723 in reaching her decision and the affirmation by the District Court was not error.
¶28 We affirm.
We concur:
MIKE McGRATH, C.J.
LAURIE McKINNON, J.
JAMES JEREMIAH SHEA, J.
DIRK M. SANDEFUR, J.

The factors set forth in § 40-4-212 (e), (f), (g), (i), (j), (k), and (m) are not implicated herein as the parties agree there are no mental or physical health problems of the parties or anyone involved, no chemical dependency issues, no unusual developmental needs of G.M.N., and no allegations of failing to pay birth-related costs, failing to financially support G.M.N., or continuing and vexatious parenting plan actions. Similarly, the factors set forth in § 40-4-219(1)(a), (c), and (d) are not applicable to the circumstances of this case.

Section 40-4-212, MCA, no longer contains rebuttable presumptions favoring custody to the parent who has provided most of the primary care during the child's life.