FILED

07/13/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0483

DA 20-0483

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2021 MT 173N

IN THE MATTER OF THE
PARENTING OF S.R.G.,

    A minor child;

LISA LARRIVEE,

        Petitioner and Appellee,

    v.

JAMES GARDNER,

        Respondent and Appellant.

| | |
|---|---|
| APPEAL FROM: | District Court of the Eighth Judicial District, In and For the County of Cascade, Cause No. ADR-18-0208 Honorable Jon A. Oldenburg, Presiding Judge |

COUNSEL OF RECORD:

        For Appellant:

            James F. Gardner, Self-Represented, Great Falls, Montana

        For Appellee:

            Noel K. Larrivee, Larrivee Law Offices, PLLC, Dayton, Montana

                        Submitted on Briefs: May 26, 2021

                        Decided: July 13, 2021

Filed:

                     _____
                               Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of non-citable cases published in the Pacific Reporter and Montana Reports.

¶2 James Gardner (Father), a member of the State Bar of Montana appearing pro se, appeals from the Findings of Fact, Conclusions of Law and Order and Final Parenting Plan entered by the Eighth Judicial District Court, Cascade County, regarding his child, S.R.G. We affirm.

¶3 Father raises the following issues:

*1. Did the District Court err by ordering Father to pay for certain activities for S.R.G.?*

*2. Did the District Court err by ordering Father to pay past insurance premiums?*

*3. Did the District Court err by disregarding the testimony of Kimberly Cummings, LCPC, at trial?*

*4. Did the District Court err by disregarding the video testimony of S.R.G.?*

*5. Did the District Court err by its allocation of parenting time in the Final Parenting Plan?*

¶4 Father and Lisa Larrivee (Mother) are the parents of S.R.G., who was born in Los Angeles, California, in May 2015. Mother and Father were never married and have not been romantically involved since 2015. In November 2015 Mother moved back to

2

Montana where she and S.R.G. have since resided. The parties acknowledge that Mother has been the primary custodial parent from S.R.G.'s birth.

¶5 In September 2017, the parties met to review a "Stipulation for Final Parenting Plan" Father had drafted, and to calculate Father's child support obligation from the Montana online calculator, which they determined to be $1,200 per month. Mother testified that Father stated he would revise the parenting plan and provide an updated version to Mother after the meeting, but did not do so. Mother thus commenced this action in April 2018, initially appearing pro se.

¶6 Following Father's motion for substitution and three district judges declining jurisdiction, the Hon. Jon A. Oldenburg accepted the case. The parties' coparenting of S.R.G. was amicable until December 18, 2018, when a dispute arose about parenting time over the holidays, leading to the appearance in the action by counsel Noel Larrivee (Larrivee), Mother's father, to represent her in the action. The parties entered a Stipulation to Interim Parenting Plan (Interim Plan).

¶7 Under the Interim Plan, Mother was designated as the primary parent with Father allotted parenting time with S.R.G. every other weekend and one weeknight of each week. Holiday parenting was divided between Mother and Father, but no provision addressed S.R.G.'s birthday. Father was required to "pay Mother $1,000.00 per month beginning on January 5, 2019 and by the fifth of each month thereafter. In addition, Father shall pay Mother $5,000.00 by January 31, 2019 and an additional $5,000.00 by July 31, 2019." The Interim Plan set out parameters for a college fund for S.R.G. and set the contributions each

3

party would make toward the costs of S.R.G.'s health insurance and activities. The District Court approved the Interim Plan and set trial for June 14, 2019.

¶8 On June 10, 2019, four days before trial, Mother filed a notice advising the court she was moving to Bozeman and requesting the issue be heard at trial. On June 12, she also filed an objection "to any continuance" of the trial, reasoning that Larrivee had incurred substantial expense to fly a witness from Alaska to testify. On June 13, the District Court, noting that Mother's notice of residency change did not comply with § 40-4-217, MCA, vacated the trial on the ground that "it would be inherently unjust to require [Father] to appear for trial to contest an unknown Final Plan with [Mother] now residing in Bozeman." Instead, a hearing was held on June 14 to discuss the interim parenting plan and to permit the Alaskan witness to testify and preserve her testimony for trial. The witness proved to be S.R.G.'s maternal grandmother, a Great Falls resident who cut short her annual trip to Alaska to be back in town to testify.[1]

¶9 Following the hearing, the court issued its Order on Interim Parenting Plan as a bridge to a final plan that largely maintained the prior Interim Plan with minor alterations to account for Mother's current residency in Bozeman. Unfortunately, the litigation had become extremely contentious and, given the tenor of Father's interactions, the Order concluded with a warning to Father that his "petty, personal, vindictive, spiteful, wrong, inappropriate, improper, and totally unnecessary" attacks upon Mother and Larrivee must

---

[1] The parties refer to S.R.G.'s maternal grandmother as "Yabba."

stop, at the risk of sanctions. Despite this admonishment, both Father and Larrivee continued to engage in antagonistic conduct.

¶10 Trial on the Final Parenting Plan was held on July 20, 2020, wherein testimony was received from Mother, Father, Yabba, a Child Support Services Division employee, and Kimberly Cummings, a child counselor retained by Father. Also admitted was a video recording of Father "interviewing" S.R.G. about her interaction with her stepbrother, L.L., and other exhibits. The District Court noted that Father's Financial Affidavit had not been filed prior to trial and that he had likewise waited until trial to advise "that his 2016, 2017, and 2018 tax returns were being filed the day of the trial[,]" a delay that ostensibly caused the trial court to task the Child Support Services Division of the Department of Public Health and Human Services to calculate the final amount of child support.

¶11 The District Court issued its Order and Final Parenting Plan on August 26, 2020. The court noted that "Lisa lives in Bozeman in a four-bedroom, 2 and ½ bath home about a block from [S.R.G.'s] school." Conversely, Father "lives in Great Falls in a two-bedroom one bath home with his significant other Destiny Freiberg; [O.G.], the toddler son of [Father] and Destiny; [T.G.,] (Destiny's 10-year-old son who visits on weekends)[;] and Zachary Gardner, adult son of [Father]." The court reasoned that "there was no testimony of an unsafe environment for [S.R.G.] in [Father's] home[,]" although she shared a bedroom with "[Father], Destiny, and [O.G.,]" whereas in Bozeman S.R.G. "has her own room." The court considered each of the "best interest" factors set forth in § 40-4-212(1), MCA, concluding that S.R.G.'s best interests would be served by primarily

residing with Mother in Bozeman. Father was granted parenting time every other weekend from Friday evening until Sunday evening during the school year, and Thursday evening until Sunday evening during summer break. Holidays were alternated between the parties. Mother's Day and Mother's birthday were awarded to Mother, and Father's Day and Father's birthday to Father. S.R.G.'s birthday, at which time S.R.G would be residing with Mother, was granted to Mother. Each parent was granted fourteen (14) vacation days, with the requirement that S.R.G. could not be away from Mother for more than five (5) consecutive days until she had turned eight years old.[2]

¶12 The court ordered Father to pay $1,000 per month for child support pending entry of an order by the Child Support Services Division. The parties were required to evenly share the cost of S.R.G.'s health insurance and to "each contribute Fifty Percent (50%) of the costs for any of the child's expenses exceeding $500.00 annually including school and summer camp tuitions and extra-curricular activities." Concerning past due obligations arising under the Interim Plan, the Order found that:

> [Mother's Exhibits] 20-23 document the expenses for [S.R.G.'s] health insurance and preschool and camp activities for 2019. That Exhibit shows the following share for [Father]: health insurance-$138. x 12 months=$1,661.28 per year; pre-school (Merry-Hearts) $297.50 x 9 months= $2,677.50/school year; and summer camp, $260/month for 3 months- $780.00. [Father's] share would them be $1661.28, plus $2,677.50, plus $780.00 for a total of $5118.78, minus the $500.00 amount specified equals $4,618.78 that [Father] owes.

Father appeals, raising the above-stated issues.

---

[2] S.R.G. is currently six years old.

¶13 We review a district court's findings of fact to determine whether they are clearly erroneous. *Czapranski v. Czapranski*, 2003 MT 14, ¶ 10, 314 Mont. 55, 63 P.3d 499 (citing *In re Marriage of Fishbaugh*, 2002 MT 175, ¶ 19, 310 Mont. 519, 52 P.3d 395). A finding is clearly erroneous if it is not supported by substantial evidence, if the trial court misapprehended the effect of the evidence, or if our review of the record convinces us that a mistake has been committed. *In re J.W.M.*, 2015 MT 231, ¶ 12, 380 Mont. 282, 354 P.3d 626. We review a district court's conclusions of law for correctness. *J.W.M.*, ¶ 12.

¶14 "A district court has broad discretion when considering the parenting of a child, and we must presume the court carefully considered the evidence and made the correct decision." *In re G.M.N.*, 2019 MT 18, ¶ 11, 394 Mont. 112, 433 P.3d 715; *accord In re Marriage of McKenna*, 2000 MT 58, ¶ 17, 299 Mont. 13, 996 P.2d 386. So long as the trial court's findings are supported by substantial, credible evidence, "we will not overturn the court in a child custody matter unless we determine that there has been a clear abuse of discretion." *Czapranski*, ¶ 10 (citing *In re Marriage of Bukacek*, 274 Mont. 98, 105, 907 P.2d 931, 935 (1995)). An abuse of discretion occurs when a district court "acts arbitrarily without conscientious judgment or exceeds the bounds of reason." *J.W.M.*, ¶ 11 (citing *In re J.C.*, 2008 MT 127, ¶ 33, 343 Mont. 30, 183 P.3d 22).

¶15 A court must determine child custody matters in accordance with the best interest of the child. *See* § 40-4-212(1), MCA. This inquiry requires that the court consider factors enumerated in § 40-4-212(1), MCA. "While the court must consider several statutory

7

factors in determining the child's best interest pursuant to § 40-4-212, MCA, it need not make specific findings pertaining to each factor." *McKenna*, ¶ 15.

¶16 Father argues the District Court erred by ordering him to share in S.R.G.'s preschool and summer nature school because these are schools, not "activities," yet neither are colleges or higher education for which he was required to contribute under the Interim Plan. He compares these functions to "day care," a term used by Yabba during her testimony. A stipulated parenting plan is enforced and interpreted under contract law. *In re Estate of Hicks*, 2011 MT 76, ¶ 10, 360 Mont. 91, 252 P.3d 175. "[I]f the language of the parenting plan is clear, i.e. unambiguous, it controls the agreement's interpretation." *Estate of Hicks*, ¶ 10. When interpreting the words of a contract, they "are to be understood in their ordinary and popular sense" unless the parties to the agreement intended otherwise. Section 28-3-501, MCA. We find no error. Interaction with other children in a learning environment is a socialization and educational activity. *See Merriam-Webster's Collegiate Dictionary* 13 (11th ed. 2003) (activity is "the quality or state of being active[,]" which can include "an educational procedure designed to stimulate learning by firsthand experience[.]").

¶17 Father argues the District Court erred by ordering him to pay past insurance premiums. He argues he "did, in fact, pay his portion of the premiums" and "there was no testimony or evidence presented that Father did not pay one-half of the insurance premium once Mother secured a new, non-subsidized policy[,]" but also contends that "there was no order" and that he "didn't have to contribute" to the insurance premium costs because the

8

Interim Plan did not require that he pay 50% of premiums unless S.R.G.'s then-current insurance plan "cease[d] to be available." The Interim Plan, which was in effect for the time period in dispute, stated:

> [Mother] shall continue to provide medical coverage through the plan as long as it is available at a reasonable cost. Mother and Father shall each pay Fifty (50%) of any co-pays and uninsured costs. Mother shall supply Father with a copy of the bills within Fifteen (15) days of receipt and Father shall pay Fifty (50%) of the costs to Mother or invoicing party within Fifteen (15) Days of receipt.
>
> Should the plan cease to be available, Mother and Father shall each pay Fifty (50%) of the new health insurance premium costs and Fifty (50%) of any deductibles, co-pays and uninsured costs.

During the hearing, Mother testified that S.R.G.'s former plan was "no longer [] available" and S.R.G.'s new plan, which insured S.R.G. for all twelve months of 2019, had a "$276.88 per month premium[,]" toward which Father did not contribute. Mother also submitted supporting documentary evidence. While Father and Larrivee engaged in contentious back-and-forth over the health insurance issue, this was the only evidence concerning whether S.R.G. was insured under a new health insurance policy in 2019. Since the testimony was not refuted and was supported by documentary evidence, we conclude the District Court's finding was supported by substantial, credible evidence, and there was no abuse of discretion.

¶18 Father argues the District Court erred in its assessment of evidence concerning potential harm to S.R.G. in Mother's household. He offered the testimony of Kimberly Cummings, a Licensed Clinical Professional Counselor specializing in helping "kids with trauma, drug addiction, [and] abuse," who Father had retained to assess S.R.G.

9

Cummings met with S.R.G. for about 12 sessions, each lasting approximately 30-45 minutes, and testified that S.R.G. "continuously [brought] up that her brother [L.L.] [was] very mean to her [and] hit[] her," and had expressed a desire to spend more time at Father's house. Cummings provided her perceptions of S.R.G.'s relationship with Mother and L.L., which the District Court summarized as being concerned about S.R.G.'s physical and mental well-being at Mother's house, and believing S.R.G. was not receiving "that female connection with her mother," as stated in her affidavit. She recommended that S.R.G. be placed primarily with Father, and that L.L. and Mother receive counseling. However, the District Court discounted this testimony, reasoning Cummings' "conclusions, allegations, and recommendations were made without Ms. Cummings ever contacting or discussing [S.R.G. and L.L.] with [Mother]; ever meeting [Mother or L.L.]; ever meeting or attempting to gather collateral information from the close family members of [Mother] who have constant contact with [S.R.G. and L.L.]; never interviewing Destiny, [T.G.], or Zachary, or conducting solid interviews with [Father]." The court concluded that a "plethora of testimony, exhibits, and documentation in this record [] refutes Ms. Cummings' recommendations and conclusions[,]" and afforded little weight to the testimony. Such evidence included Yabba's testimony that L.L. did not attack and injure S.R.G., as Father contended, but rather S.R.G. fell while getting out of a vehicle; various testimony minimizing the perceived negative relationship between S.R.G. and L.L. and describing typical sibling conflict; and evidence that S.R.G. was happy residing at Mother's house. We conclude the District Court's conclusion was not erroneous.

10

¶19 On a related issue, Father argues the District Court erred by ignoring asserted mistreatment of S.R.G. by L.L., as discussed in a video conversation she had with Father, and her articulated desire to live with him. The child's preferences for custody are indeed a factor to be considered by a district court when making a custody determination. Section 40-4-212(1)(b), MCA; *see also* § 40-4-219(1)(c), MCA (limiting consideration of the desires of the child when amending a parenting plan to children over the age of 14). However, the trial court is under no duty to interview the child to discern her preferences and "is not required to make specific factual findings regarding the children's preferences." *Bukacek*, 274 Mont. at 105, 907 P.2d at 935. The District Court stated that it "did not interview the child due to her tender age and therefore does not know her wishes." Father contends the court ignored S.R.G.'s desire to reside primarily with him, but the transcript of the conversation with Father does not contain a clear expression by S.R.G. about wanting to reside primarily with Father; rather, it largely deals with the squabbles S.R.G. is having with L.L. There was extensive evidence also illustrating that S.R.G. was happy and thriving at the homes of both Mother and Father.

¶20 Father alleges that "[t]he Final Parenting Plan inexplicably contains [] gender-based biases[.]" Father finds error in Part III (C) of the Final Parenting Plan that gives Mother parenting time every Mother's Day, all of Mother's birthdays, and all of S.R.G.'s birthdays. Father does not mention that he received parenting time annually on Father's Day and on his birthday. Concerning S.R.G.'s birthday, a district court may consider "the child's adjustment to home, school, and community" when determining the best interest of the

11

child. Section 40-4-212(1)(d), MCA. Given that the parties no longer reside in the same city and S.R.G. has begun school, it appears reasonable that Mother would exercise parenting on S.R.G.'s May birthday to coincide with Mother's primary parenting during the school year and for S.R.G. to be able to celebrate with school friends. Regarding the provision that Father not use his allotted vacation time more than five consecutive days in a row until S.R.G. turns eight years old, it is well with the province of the District Court to determine it is in S.R.G.'s best interest to not spend an extended period of time away from Mother, her primary parent since birth, during her young years. *See* § 40-4-212(1)(h), MCA (determining the best interest of a child includes consideration of "continuity and stability of care"). The provision requiring that, should Father or any member of Father's house have symptoms of illness, any visitation must be rescheduled until the sick person is symptom free is clearly in the best interest of the child, particularly during times of public health concerns. The Final Parenting Plan was issued in the midst of the COVID pandemic and to limit visitation when the result may be harmful exposure to S.R.G. is prudent. *See* § 40-4-212(1)(e), MCA (determining the best interest of a child includes consideration of "the mental and physical health of all individuals involved"). The same bears true for the provision requiring that Father notify Mother if S.R.G. becomes ill while in Father's care—it was designed to allow Mother to prepare and get herself tested

12

for illness. *See* § 40-4-212(1)(e), MCA. We conclude the Final Parenting Plan does not contain biased provisions.[3]

¶21 Finally, Father faults the District Court's election not to follow local district court guidelines for allocation of time in a parenting plan. For a child aged three to five, the guidelines suggest no additional time for the nonprimary custodial parent in the summer. For a child over the age of five, the guidelines suggest the nonprimary parent be granted "[o]ne-half of the school summer vacation." At the time of the hearing, S.R.G. was age five, and, technically, would have been considered under the guideline for children of ages three to five. Although the guideline for children over the age of five would now be applicable to S.R.G., we conclude there was no abuse of discretion in the District Court's summer custody allocation. The parenting plan guidelines state they are "only a general direction for parents" and "are not compulsory rules[.]" As such, a district court "reserves the right to set whatever parenting plan best meets the needs of the children[.]" Here, the District Court acknowledged the guidelines, but relied upon substantial evidence to depart from them.

¶22 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of

---

[3] We agree that the parties and the parenting plan should enhance the opportunity for Father to contact or communicate with S.R.G. on her birthday, and to receive reports concerning medical care received by S.R.G. while with Mother.

applicable standards of review, for which there was no abuse of discretion.  This appeal presents no constitutional issues, no issues of firm impression, and does not establish new precedent or modify existing precedent.

¶23    Affirmed.

/S/ JIM RICE


We concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR