FILED

10/07/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0009

DA 25-0009

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 227N

_____

IN THE MATTER OF:

P.M.L.O.,

    A Youth in Need of Care.

_____

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DN 23-089
Honorable Donald Harris, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Abby Shea, Hathaway Law Group, Missoula, Montana

    For Appellee:

        Austin Knudsen, Montana Attorney General, Christine Hutchison, Assistant Attorney General, Helena, Montana

        Scott Twito, Yellowstone County Attorney, Leah Linger, Deputy County Attorney, Billings, Montana

_____

Submitted on Briefs:  July 9, 2025

Decided:  October 7, 2025

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1     Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent.  Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2     N.V.G. appeals the December 3, 2024 Findings of Fact, Conclusions of Law, and Order of the Thirteenth Judicial District Court, Yellowstone County, terminating her parental rights to her daughter, P.M.L.O.  We affirm.

¶3     P.M.L.O. was born in May 2018 and is the daughter of N.V.G. and J.W.O. (collectively, "Parents").[1]  In December 2018, P.M.L.O. was first removed from the care of her Parents.  The reasons for removal were domestic violence; methamphetamine use; alcohol abuse; unsanitary and unsafe home conditions including animal feces; illegal drugs; drug paraphernalia in reach of the child; and significant neglect of P.M.L.O. and other children in the home.  N.V.G. and J.W.O. struggled with sobriety, but P.M.L.O. was returned to their care following their completion of treatment plans, including outpatient treatment for substance abuse, in September 2019.  In September 2020, P.M.L.O. was removed a second time due to daily methamphetamine and alcohol use by her Parents, domestic violence, and neglect.  The Parents again completed treatment plans and

---

[1] This appeal only concerns N.V.G.'s parental rights and J.W.O. is not a party.  However, the record indicates N.V.G. and J.W.O. intended to coparent P.M.L.O.  Thus, facts related to J.W.O. are relevant to our discussion of N.V.G.'s parental rights.

P.M.L.O. was returned to their care in March 2022. By September 2022, both Parents had relapsed with methamphetamine and alcohol. J.W.O. burned the family house down after he heard voices telling him to do so. At the time, he was unaware if P.M.L.O. and N.V.G. were in the home. The family dogs died in the fire, traumatizing four-year-old P.M.L.O.

¶4 P.M.L.O. was removed a third time from her Parents' care on March 31, 2023, due to their continued methamphetamine use and alcohol use, ongoing domestic violence, her exposure to illegal substances, and unsafe and unstable living conditions. Responding caseworkers found methamphetamine paraphernalia as well as baggies of methamphetamine. J.W.O. and N.V.G. tested positive for methamphetamine at the time of removal. A hair follicle test conducted on P.M.L.O. on April 3, 2023, was positive for methamphetamine, indicating methamphetamine use in proximity to her. Following her removal, P.M.L.O. was first placed with B.F., the daughter-in-law of P.M.L.O.'s maternal great aunt, S.F., until October 2023. Then, P.M.L.O. was placed with S.F., whom she refers to as a grandmother.

¶5 P.M.L.O. had previously been placed with B.F. for nine months during her first removal and again for 11 months during her second removal. When initially placed with B.F. and S.F. following her third removal, P.M.L.O. was behind in school, had bad eating habits and poor hygiene, and was unaccustomed to having a daily routine. She expressed fear and anger at J.W.O. for burning the family house down and the deaths of the two dogs.

¶6 N.V.G. has a long history of methamphetamine use and alcohol abuse. J.W.O. similarly struggles with methamphetamine and alcohol abuse. He was diagnosed with

schizophrenia in January 2024, which manifests in erratic behaviors, auditory hallucinations, and delusions when he stops taking his prescribed medications. Both Parents completed Department of Public Health and Human Services (DPHHS) treatment plans during P.M.L.O.'s two previous removals but relapsed after the end of DPHHS supervision in both instances.

¶7 On April 6, 2023, DPHHS filed a petition to terminate N.V.G.'s parental rights and for relief from its duty to provide reunification services ("Petition"). Based on the facts in the Petition and accompanying affidavit, the District Court awarded immediate protection and emergency protective services to DPHHS over P.M.L.O. on April 7, 2023. At the May 11, 2023 show cause hearing following the Petition, the Parents stipulated to emergency protective services. The court determined probable cause existed that P.M.L.O. was in danger of being abused or neglected, DPHHS had made reasonable efforts to prevent the necessity of removing her from N.V.G.'s care, an out-of-home placement was in her best interests, and the emergency services requested by DPHHS were necessary for the immediate protection of P.M.L.O. DPHHS provided testimony that P.M.L.O. was "thriving" in the care of B.F. and would soon graduate from preschool "ready for kindergarten in the fall." Conversely, although negative for other substances, N.V.G. had produced a positive drug test for THC. N.V.G. claimed she was otherwise participating in a substance abuse support group, had completed a chemical dependency evaluation, had an individualized mental health therapy plan, and was engaged with a treatment program on her own initiative.

¶8 In a May 12, 2023 written order, the District Court designated P.M.L.O. a Youth in Need of Care pursuant to § 41-3-102, MCA. By a June 8, 2023 status hearing, DPHHS reported N.V.G. remained engaged with DPHHS but had tested positive for alcohol and continued to test positive for THC. N.V.G. had expressed frustration with only having one visit per week with P.M.L.O., but DPHHS reported extra visits were denied because of P.M.L.O.'s fear of J.W.O.

¶9 Parents completed inpatient treatment by the end of July 2023, but DPHHS was unaware of their continued engagement with personal treatment due to the Parents' refusal to release information to DPHHS. Despite not offering services to the Parents, DPHHS provided for and continued to renew referrals for random drug testing at a local clinic during the duration of the termination proceedings. Parents did not participate in random drug testing and instead endeavored in a personally designed treatment plan which included counselling and support groups offered through a local church.

¶10 Parents and DPHHS attempted mediation regarding the possibility of guardianship rather than termination. At an August 31, 2023 hearing on the motion to continue the Petition hearing, DPHHS provided an update to the court that N.V.G.'s engagement was "not going great," including issues responding to DPHHS contact as well as lack of acceptance of DPHHS's referral for random drug testing. N.V.G. represented that she wore a drug patch, but she had missed one drug test and needed to reschedule. P.M.L.O.'s guardian ad litem (GAL) represented that P.M.L.O. continued to ask for more visits with her Parents, but there had been issues with their engagement during those visits. The GAL

also reported that P.M.L.O. was "happy and thriving in her placement" and adapting well to kindergarten.

¶11 At an October 12, 2023 status hearing, DPHHS reported P.M.L.O. continued to do well with her kinship placement but visits with her Parents were "not beneficial to her." J.W.O. had been recently diagnosed with a serious mental health condition but was not engaging with DPHHS "at all." N.V.G. likewise was not engaging with DPHHS, but both Parents were continuing to participate in their own personal treatment regimens. The court held another hearing on continuing DPHHS's Petition on December 14, 2023, wherein DPHHS reported N.V.G. was not engaging with DPHHS or participating in drug testing.

¶12 The District Court began the hearing on the Petition on January 11, 2024. The DPHHS Child Protection Specialist (CPS) in charge of P.M.L.O.'s case since May of 2023 testified, beginning with a summary of P.M.L.O.'s previous removals. As to why DPHHS petitioned for no reunification services, the CPS testified that, given the extent of the duration of P.M.L.O.'s removals from the home and the continued conditions necessitating those removals, DPHHS believed returning P.M.L.O. to the care of her parents carried a "substantial risk for continued abuse and neglect." To DPHHS's knowledge, N.V.G. had not submitted to drug testing. The CPS testified to P.M.L.O.'s continued wellbeing with S.F.

¶13 On the second day of the hearing on February 1, 2024, the CPS again testified that P.M.L.O. had received a Post Traumatic Stress Disorder diagnosis from her counselor. Further, the CPS reported that the Parents had exhausted "any services" DPHHS could

have provided during previous DPHHS involvement. Despite P.M.L.O.'s ongoing fear of J.W.O., N.V.G. made no attempts "to be protective" of P.M.L.O. or "address her fears" following the family home burning down and the death of P.M.L.O.'s pets. As far as the CPS understood, N.V.G. and J.W.O. intended to parent P.M.L.O. together upon reunification, but the CPS could not provide any evidence of either parent's ability to meet P.M.L.O's health and safety needs, appropriately attend to her emotional and mental wellbeing, or provide stable parenting. Moreover, the CPS was concerned that N.V.G.'s recovery had not been adequately addressed as she had not provided DPHHS with any evidence of successfully dealing with her addictions. Concerning the Parents' drug use, the CPS noted the April 2023 positive hair follicle test conducted on P.M.L.O. The CPS claimed she had never encountered a family this "engrained into drug use" and that DPHHS did not believe the parents could change their behavior. The CPS again noted the Parents' lack of participation with DPHHS's referral for random drug testing. The court heard additional testimony from S.F. regarding N.V.G.'s struggles with addiction, the impact of that addiction on P.M.L.O., and P.M.L.O.'s progress in the care of S.F. and B.F. since the third removal. S.F. testified that if she were to adopt P.M.L.O. upon the termination of N.V.G.'s parental rights, she would facilitate safe contact between P.M.L.O. and N.V.G.

¶14 On the third day of the hearing on February 22, 2024, the court heard testimony from the visitation coach regarding N.V.G.'s behavior during interactions with P.M.L.O. She testified that, although the first visit proceeded well, she noticed "facial ticking" by N.V.G. during the second visit. In a subsequent visit, N.V.G. repeatedly asked P.M.L.O.

about her school and seemed to not remember asking. The visit coach identified these behaviors as creating a concern of drug use by N.V.G. However, these behaviors did not result in prematurely ending a visit. The visit coach further testified it was reported to her that J.W.O. slept during the first visit and missed the next "one or two" visits due to illness.

¶15 B.F. testified to developmental delays she witnessed in P.M.L.O. following her first removal, including motor skills and digestive issues. When P.M.L.O. stayed with B.F. during her second removal, N.V.G. appeared intoxicated during one visit. Upon the third removal, B.F. worked to create a routine and structure for P.M.L.O., improve her dietary habits, and prepare her academically for kindergarten. P.M.L.O. frequently and spontaneously brought up her fears resulting from the fire in the family home, and she returned from visits with her parents "moody and uncontrollable" or "angry."

¶16 P.M.L.O.'s maternal grandfather ("Grandfather") testified regarding the times N.V.G. and J.W.O. lived in his basement with P.M.L.O. During this time, Grandfather would occasionally watch P.M.L.O. if the parents could not, but only "[j]ust hours, never [. . .] for a full day." Grandfather's testimony continued at the fourth day of the hearing on March 21, 2024. He asserted P.M.L.O. had been well-cared for by her parents and that he never suspected N.V.G. was using drugs while living in his home. He was aware of P.M.L.O.'s "sadness" at losing her dogs in the house fire. He testified that N.V.G. would avoid methamphetamine while under supervision but relapsed when supervision ended. Still, he believed N.V.G. was a "great" parent even when she was using drugs. Grandfather asserted, "Nothing has ever happened bad to [P.M.L.O.]"

8

¶17 N.V.G. also testified to her addiction treatment history. She admitted the first two removals resulted from her drug use. She further acknowledged that although she was under the influence of methamphetamine while caring for P.M.L.O., she never used drugs in front of her daughter. She confirmed reports of an overflowing potty-training toilet in the basement but denied the presence of animal feces. N.V.G.'s testimony continued during the fifth day of the hearing on April 18, 2024. She claimed she had only used methamphetamine outside the home and reiterated her denial of using methamphetamine around P.M.L.O. Despite distrust of the methodology of the hair follicle test, she did acknowledge that a hair follicle test of P.M.L.O. administered after the third removal was positive for methamphetamine. She admitted that a relapse into methamphetamine use precipitated the third removal. N.V.G. claimed she had been participating in drug testing every week since the last court date and typically tested right before a court date, but she only provided the results of that testing to her attorney and not DPHHS. Because N.V.G. had not signed the information release forms, DPHHS could not obtain the drug test results. Regardless of her proclaimed disbelief in the positive hair follicle test resulting from environmental methamphetamine contamination, N.V.G. asserted she had cleaned the basement apartment. N.V.G. admitted that safety issues would need to be resolved prior to returning P.M.L.O. to her care and she expressed a desire to complete another DPHHS treatment plan.

¶18 N.V.G.'s attorney introduced negative drug testing results from N.V.G.'s scheduled tests over the objection of DPHHS. On recross examination, N.V.G. acknowledged these

tests were not random tests.  At the close of the fifth hearing day on April 18, 2024, the court addressed the parties, expressing dismay at the failure of N.V.G. and J.W.O. in taking advantage of the open referral from DPHHS for additional drug testing and skepticism of the results introduced by N.V.G.  The court concluded the hearing:

> Before you leave—I'm not done—so I have to say that last time we were together I mentioned that I was hoping to hear from [N.V.G.'s probation officer], I was hoping to have testing results, I was hoping to see steady employment, I was hoping to see safe, stable housing, and I wanted releases of information.
>
> In my notes, I have a note here that [the CPS] said that she has sent a referral for the parents for drug testing, that the parents did not follow up, but its still an open referral, and I have to tell you I'm extraordinarily alarmed that the parents haven't taken advantage of that.   I can tell you your drug testing results don't mean that much to me because they're not random, they don't test for Fentanyl, [. . .] I see the result, but I have no idea of the quality of the lab that's doing them, I don't know anything about that.
>
> And the idea that you would not have signed releases of information is absolutely extraordinary to me.  If you won't do those two things, why on earth would this [c]ourt believe that now you are going to work with [DPHHS] if I determine that you are entitled to a treatment plan.
>
> So the only thing that's good that can come out of this delay until [the next hearing,] is that those things still hold.  I want releases, I don't think [DPHHS] should have to take your word for the treatment that you are getting.  I don't think [DPHHS] should have to take your word for your testing results.  They are entitled to have verification of those things, and that's meaningful to this [c]ourt so I'm telling you on June [13]th, if you haven't made progress on employment, safe, stable housing, the releases of information and testing results, I'm not going to be pleased.

¶19    The final day of the hearing occurred on June 13, 2024, and began with cross-examination of J.W.O., who testified to the couple's ongoing struggles to find housing.  J.W.O. had begun the process of getting on Social Security Disability due to his mental health issues.  Regarding J.W.O.'s use of his medical marijuana card, J.W.O.

conceded to not having a prescribed dosage, only a caution to not "abuse [his] medication." His preferred way of consuming marijuana is smoking and he keeps the product in a childproof bag in his drawer. He claimed he would not smoke around P.M.L.O. but would "go in the other room or outside." He asserted that he could sense when his mental condition verged on deteriorating and had a plan to call his counselor in that event.

¶20 DPHHS recalled the CPS as a rebuttal witness. DPHHS had still not received any release of information from N.V.G. regarding her personal treatment regimen. DPHHS noted that, given the aggravating circumstances, removal was in P.M.L.O.'s best interest and did not offer services to the parents. Despite not offering services, the CPS still made several attempts to encourage the Parents to participate with DPHHS but received little contact in return. J.W.O. had submitted releases for his mental health records, but neither parent took advantage of the open drug testing referral until between the fifth and sixth days of the hearing on the Petition. Following their intake with the recommended drug testing facility, N.V.G. and J.W.O. produced clean test results, except for J.W.O.'s positive result for medical THC. DPHHS had requested a hair follicle test of the Parents to determine drug use in the previous six months, but the Parents objected. At their initial intake on the DPHHS referral for random drug testing, N.V.G. and J.W.O. refused to perform alcohol testing after admitting to drinking the night before. As far as the CPS knew, N.V.G. still lacked employment and had not provided confirmation of sustained employment during the third removal.

¶21 In the absence of parental contact or releases of information, DPHHS relied on reports maintained as part of its case management system. A concerned individual had submitted a report on May 2, 2024, after N.V.G. had allegedly attempted to purchase a vehicle with methamphetamine and showed this individual "her purse was full of methamphetamine." The individual reported that N.V.G. had been behaving erratically and mentioned "that she was trying to get her kids back and needed to be able to have transportation in order to do so." N.V.G. was scheduled to attend a supervised visit with P.M.L.O. after this interaction. The individual was familiar with N.V.G. and claimed to have seen her "frequently" at area casinos under the influence. Evidence of this report was admitted over the objections of the Parents, who provided no rebuttal evidence.

¶22 The District Court found that N.V.G. had subjected P.M.L.O. to "aggravating circumstances" under § 41-3-423(2)(a), MCA, and thus termination was appropriate as provided for by § 41-3-609(1)(d), MCA. The court found P.M.L.O. improved under the care of S.F. and B.F., she had developed a "close, loving relationship with [B.F.], [S.F.], and their families," and S.F. would provide her with a safe stable home. Further, the court found that J.W.O. and N.V.G. had failed to introduce any evidence that they had undergone consistent random drug and alcohol testing to demonstrate prolonged sobriety. The Parents remained unemployed and still lived with Grandfather. The court found the repeated removals due to chronic, severe neglect, including exposure to illicit drugs traumatized P.M.L.O. The court determined clear and convincing evidence proved preservation or reunification services were unnecessary because such services were unlikely to be any

more effective than they had been in the past. Clear and convincing evidence also established P.M.L.O. experienced severe neglect under her Parents' care. The court concluded that P.M.L.O.'s best interests would be served by terminating both Parents' parental rights and that attempts to reunify the family would likely result in P.M.L.O. experiencing unnecessary stress and anxiety with little hope her Parents could be able to provide her with a safe, stable home within a reasonable time. The court granted permanent legal custody of P.M.L.O. and the authority to consent to her adoption, guardianship, or other permanent placement to DPHHS.

¶23    On appeal, N.V.G. asserts the District Court failed to consider P.M.L.O.'s best interests in terminating N.V.G.'s parental rights.

¶24    We review a district court's decision to terminate parental rights for an abuse of discretion. *In re D.B.*, 2007 MT 246, ¶ 16, 339 Mont. 240, 168 P.3d 691. "We will presume that a district court's decision is correct and will not disturb it on appeal unless there is a mistake of law or a finding of fact not supported by substantial evidence that would amount to a clear abuse of discretion." *In re M.N.*, 2011 MT 245, ¶ 14, 362 Mont. 186, 261 P.3d 1047 (quotation omitted). It is not this Court's function to reweigh conflicting evidence or substitute its judgment regarding the strength of the evidence for that of the district court. *In re G.M.N.*, 2019 MT 18, ¶ 11, 394 Mont. 112, 433 P.3d 715 (citation omitted).

¶25    Family integrity is a constitutionally protected interest, but this interest must yield if family integrity comes at the expense of the child's best interest. *In re E.A.T.*, 1999 MT 281, ¶ 32, 296 Mont. 535, 989 P.2d 860 (citation omitted). The child's best interests and

13

welfare is the "paramount consideration[.]" *In re E.A.T.*, ¶ 32 (citing *In re C.G.*, 230 Mont. 117, 120, 747 P.2d 1369, 1371 (1988)). "'Best interests of the child' means the physical, mental, and psychological conditions and needs of the child and any other factor considered by the court to be relevant to the child." Section 41-3-102(5), MCA. "If a child has been in foster care under the physical custody of the state for 15 months out of the most recent 22 months, the best interest of the child must be presumed to be served by termination of parental rights." Section 41-3-604(1), MCA.

¶26 Here, N.V.G. concedes the duration of P.M.L.O.'s foster care placement gives rise to a presumption that termination is in the child's best interests. Our review of the record does not support N.V.G.'s argument that the District Court did not consider P.M.L.O.'s best interests. Indeed, the District Court calculated that, in the 78 months between P.M.L.O.'s birth and the date of its termination order, P.M.L.O. had been out of N.V.G.'s care for a total of 45 months. Between the third removal and the final day of the Petition hearing, P.M.L.O. already had been removed for approximately 15 months. In considering P.M.L.O.'s physical, mental, and psychological wellbeing, the court recognized P.M.L.O.'s progress in overcoming developmental delays under the care of B.F. and S.F., and contrasted the stability of her placement with the repeated, traumatic removals from N.V.G. precipitated by severe neglect. N.V.G. remained committed to coparenting with J.W.O., despite a history of using and relapsing together, but the District Court found she had not obtained stable employment or housing prior to the final day of the hearing and thus reunification would likely result in continued trauma for P.M.L.O. Moreover, the

14

District Court noted N.V.G.'s participation in outpatient treatment programs, but the court found her concurrent refusal to undergo random drug and alcohol testing demonstrated to the court an ability to maintain prolonged sobriety necessary to provide a safe, stable home for P.M.L.O. The District Court found returning P.M.L.O. to the care of N.V.G. would risk subjecting her again to the risk of continued chronic neglect, exposure to drug and alcohol abuse, exposure to domestic violence, and additional trauma should future removals prove warranted based upon N.V.G.'s history with DPHHS and a lack of evidence proving she had overcome her cycle of addiction. In contrast, the court found, based on clear and convincing evidence of P.M.L.O.'s improvement under the care of her great-aunt, that S.F. had provided and would continue to provide a safe and stable home.

¶27 Importantly, N.V.G. does not claim the factual findings of the District Court were erroneous. Rather, she asserts the District Court erred by determining termination was in P.M.L.O.'s best interests by not ascribing more weight to N.V.G.'s claims of progress towards addiction recovery than the evidence presented by DPHHS. N.V.G. supplements this argument by relying on the testimony of Grandfather and the visitation coach as evidence of positive interactions between mother and daughter. However, the District Court was in the best position to evaluate the best interests of the child. *In re Z.N.-M.*, 2023 MT 202, ¶ 40, 413 Mont. 502, 538 P.3d 21. This Court is not positioned to reevaluate "the evidence for a different outcome[.]" *In re A.B.*, 2020 MT 64, ¶ 40, 399 Mont. 219, 460 P.3d 405. Viewing the evidence in a light most favorable to DPHHS as the prevailing party, we cannot say the court acted arbitrarily, without employment of conscientious

judgment, or exceeded the bounds of reason resulting in substantial injustice by terminating N.V.G.'s parental rights. *In re A.B.*, ¶ 40. We conclude the District Court did not abuse its discretion because clear and convincing evidence in the record supports the finding that P.M.L.O.'s best interests were served by the termination of N.V.G.'s parental rights.

¶28 Finally, we address N.V.G.'s argument the District Court abused its discretion by not considering guardianship prior to terminating her parental rights. The permissive language of § 41-3-609(1), MCA, does not require "consideration of other options, such as guardianship," once the statutory criteria for termination are met. *In re E.A.T.*, ¶ 33. Here, the District Court had no obligation to consider guardianship as an alternative to termination and proceeding to termination without doing so did not constitute a mistake of law. The District Court did not abuse its discretion by not considering guardianship prior to termination.

¶29 Ultimately, the District Court terminated N.V.G.'s parental rights due to N.V.G.'s history of drug and alcohol abuse, lack of stable employment and housing, the duration of removal, and severe neglect of P.M.L.O. The District Court was in the best position to evaluate the best interest of P.M.L.O., had no legal obligation to consider guardianship as an alternative, and its conclusion was supported by clear and convincing evidence in the record. Accordingly, the District Court did not abuse its discretion in terminating N.V.G.'s parental rights.

¶30 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the

16

Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶31    Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ KATHERINE M BIDEGARAY
/S/ BETH BAKER
/S/ JIM RICE